# Exhibit A

<pre>
 1                  IN THE UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3
    UNITED STATES OF AMERICA,        ) Docket No. 20 CR 309-1
 4                                    )
                         Plaintiff,)
 5                                    )
                  vs.                 )
 6                                    )
    LARRY JONES,                      ) Chicago, Illinois
 7                                    ) July 2, 2020
                         Defendant.) 1:00 o'clock p.m.
 8

 9      TRANSCRIPT OF PROCEEDINGS - TELEPHONIC DETENTION HEARING
         BEFORE THE HONORABLE BETH W. JANTZ, MAGISTRATE JUDGE
10

11  TELEPHONIC APPEARANCES:

12
    For the Plaintiff:         HON. JOHN R. LAUSCH, JR.
13                             United States Attorney
                               BY:  MR. GRAYSON S. WALKER
14                                  MR. JOHN D. MITCHELL
                               219 S. Dearborn St., Suite 500
15                             Chicago, Illinois  60604

16
    For the Defendant:         LAW OFFICES OF JAMES D. TUNICK
17                             BY:  MR. JAMES D. TUNICK
                               650 N. Dearborn St., Suite 700
18                             Chicago, Illinois  60654

19
    Also Present:              MR. JUSTIN WIERSEMA, Pretrial
20

21  Court Reporter:            MR. JOSEPH RICKHOFF
                               Official Court Reporter
22                             219 S. Dearborn St., Suite 2128
                               Chicago, Illinois  60604
23                             (312) 435-5562
               * * * * * * * * * * * * * * * * *
24

25                        PROCEEDINGS RECORDED BY
                          MECHANICAL STENOGRAPHY
                     TRANSCRIPT PRODUCED BY COMPUTER
</pre>

1       (Proceedings had remotely, via telephone conference:)

2              THE CLERK:  20 CR 309, USA vs. Larry Jones.

3   Detention hearing.

4              THE COURT:  Good afternoon, everyone.  Judge Jantz

5   here.  I will have everyone introduce themselves for the

6   record and spell their names, as well.

7              I'll start with government counsel, please.

8              MR. WALKER:  Good afternoon, Judge, Grayson Walker

9   and John Mitchell for the United States.  G-r-a-y-s-o-n,

10  W-a-l-k-e-r; John Mitchell, J-o-h-n, M-i-t-c-h-e-l-l.

11             THE COURT:  Great.

12             And for the defense?

13             MR. TUNICK:  Good afternoon, your Honor, James

14  Tunick, T-u-n-i-c-k, on behalf of Larry Jones.

15             Also on the phone is Geraldine Moore, which is Larry

16  Jones' grandmother, who we've substituted as a proposed

17  third-party custodian.  And Ms. Moore is actually also with

18  Ms. Houston listening to the proceedings.

19             THE COURT:  Okay.

20             Thank you, ladies, for being on.

21             And, Mr. Jones, we've got you on, as well.  Can you

22  hear okay?

23             THE DEFENDANT:  Yes, ma'am.  I hear everything clear.

24  Thank you.

25             THE COURT:  Okay.  Good.

1           So, thank you to Ms. Moore and Ms. Houston for being

2   on, as well.

3           Mr. Tunick, do you expect anyone to testify or, if we

4   got that far, the usual admonishment of a third-party

5   custodian?

6           MR. TUNICK:  Judge, in light of where we're at with

7   Ms. Moore, I don't expect anybody to testify.  If we get to

8   that point, surely it would just be admonishment of the

9   third-party custodian.

10          THE COURT:  Okay.

11          And that will be subject if the government wants

12  anything less or further.  I think that's the way to proceed.

13  And I don't mean to suggest I've come to a conclusion yet.

14  I'm just sort of thinking ahead how the proceedings need to

15  go.

16          Do we have a Pretrial officer on the line?

17          MR. WIERSEMA:  Yes, Judge, Justin Wiersema, Pretrial

18  Services.  I'm stepping up for Daniel Dominguez on behalf of

19  Pretrial Services.

20          THE COURT:  Okay, Officer.  Good afternoon.

21          We anticipate taking testimony from two agents.

22          Is this correct, government?

23          MR. WALKER:  Yes, Judge.

24          THE COURT:  Okay.

25          So, in the interest of Officer Wiersema's time, my

1   suggestion would be that he would not need to be -- he would

2   not need to listen to that testimony and we could have him

3   back on at the end of the hearing for the actual detention

4   part of things.

5          Is everyone okay with that?

6          MR. TUNICK:  Judge, can you repeat that?

7          MR. WALKER:  That's fine with the government.

8          MR. TUNICK:  Judge, can you repeat?

9          THE COURT:  Yeah.  Yeah.  Basically, rather than

10  having Officer Wiersema listen to testimony --

11         MR. TUNICK:  Oh.

12         THE COURT:  -- I was just suggesting that we could

13  just let him know if and when we needed him later, so that he

14  could use his time productively.

15         MR. TUNICK:  Absolutely.  That's fine.

16         THE COURT:  Okay.

17         So, Officer, how can we get a hold of you later if we

18  need you?

19         MR. WIERSEMA:  Your Honor, I will communicate with

20  your courtroom deputy and she would advise me if I'm needed

21  back in the hearing.  So, I will sign off.  Thanks for that,

22  Judge.

23         THE COURT:  Okay.  Thank you for being on.

24         Great.  Okay.  And, so, as we did in the two previous

25  hearings, we're proceeding telephonically.  Mr. Jones does

1   have a right to an in-person hearing, and I want to make sure

2   that the defense is comfortable proceeding telephonically.

3          Is that the case?

4          MR. TUNICK:  Yes, your Honor.

5          THE COURT:  Okay.

6          And I would note this is a public line that was on

7   the docket.  So, anyone can call in and listen if they're so

8   inclined.

9          So, where we left things is that the government has

10  moved to detain Mr. Jones pending trial of this matter.  I

11  just want to confirm everyone's received the Pretrial Services

12  report.

13         Government, you have that?

14         MR. WALKER:  Yes, Judge.

15         THE COURT:  Okay.

16         And, Mr. Tunick, you received the Pretrial Services

17  report, as well, correct?

18         MR. TUNICK:  I have, your Honor.

19         THE COURT:  Okay.

20         And, so, prior to the last detention hearing, which

21  was scheduled for Tuesday, the government had forwarded some

22  information that they wanted to rely on, and the Court

23  expressed that it would not accept -- if the government was

24  going to rely on that, it would not accept that in proffer

25  form; only that it would need to be proven up by testimony --

1 attempted to be proven up by testimony -- and that would give

2 the defense an opportunity to cross-examine on those issues,

3 as well. So, that's what we're going to do today.

4 And, then, at the end, you know, taking into account

5 that testimony and cross-examination, we'll go through the

6 usual consideration of the detention factors.

7 Anything else we should take up before we get going

8 with testimony?

9 MR. WALKER: No, Judge, not from the government's

10 perspective.

11 MR. TUNICK: No, not from the defense either, Judge.

12 THE COURT: Okay.

13 And, Mr. Tunick, I know the government forwarded to

14 us some proposed exhibits. Did you get a copy of those, as

15 well?

16 MR. TUNICK: I have received the government's

17 exhibits through e-mail. And there was a small production

18 made yesterday to me.

19 THE COURT: Okay. Great. I just want to make sure

20 you had seen those.

21 Okay. So, if the government wants to call its first

22 witness.

23 MR. WALKER: Yes, Judge.

24 Just for planning purposes, John Mitchell is going to

25 be doing the direct examination of Special Agent Paul Daou,

1  and then I will be doing the direct examination of Special

2  Agent Thomas Sheehan.  Both special agents are on the line

3  with us.

4          THE COURT:  Great.  Whoever wants to go first.

5          MR. MITCHELL:  Thank you, your Honor.

6          This is John Mitchell.  And I'm actually here in the

7  Dirksen building in the same room with Special Agent Paul

8  Daou.  And, so, if it's okay, I'll just get started.

9          THE COURT:  Yeah, go ahead.

10         I'll ask Agent Daou to raise his right hand.

11         THE WITNESS:  Right hand raised, ma'am.

12         THE COURT:  Thank you.

13         Can you state and spell your name for the record,

14  Agent.

15         THE WITNESS:  Paul Daou.  P-a-u-l, D-a-o-u.

16         THE COURT:  What agency do you work for?

17         THE WITNESS:  Bureau of Alcohol, Tobacco, Firearms &

18  Explosives.

19      (Witness sworn.)

20         THE COURT:  Mr. Mitchell, take it away.

21         MR. MITCHELL:  Thank you, your Honor.

22                PAUL DAOU, PLAINTIFF'S WITNESS, SWORN

23                        DIRECT EXAMINATION

24  BY MR. MITCHELL:

25  Q.  You testified a moment ago that you are employed by ATF;

1  is that right?

2  A.  That's correct.

3  Q.  What is your position at ATF?

4  A.  Special agent.

5  Q.  How long have you been a special agent with ATF?

6  A.  For approximately five years.

7  Q.  Would you please explain to the Judge, just in general

8  terms, what your duties are as a ATF special agent?

9  A.  My duties are to investigate violations involving violent

10  crimes, narcotics trafficking, firearms trafficking, and

11  organized crime.

12  Q.  As part of your work for ATF as a special agent, have you

13  worked on an investigation of narcotics trafficking and

14  firearms offenses by Larry Jones and others?

15  A.  I have.

16  Q.  And this part of the investigation, it was led by ATF; is

17  that right?

18  A.  It was.

19  Q.  So, were there any other law enforcement agencies involved

20  in the investigation of the suspected narcotics trafficking

21  and firearms offenses by Larry Jones?

22  A.  There were.  The Chicago Police Department and the Drug

23  Enforcement Administration.

24  Q.  This part of the investigation, did it involve the use of

25  a confidential source?

1  A.  It did.

2  Q.  And at times during your testimony, I'm going to refer to

3  the confidential source, either by that name or as a CS.  I'll

4  try to use "confidential source," but sometimes habit leads me

5  to use CS.  Is that okay?

6  A.  It's okay.

7  Q.  So, I want to ask you some questions about --

8          THE COURT:  Mr. Mitchell, let's ask our court -- I

9  think the court reporter's on the line.  Let's ask him what's

10  easiest for him.  You know, I'm going to know what you mean.

11  I don't have a jury here.

12          So, if our court reporter wants to chime in, do you

13  have a preference?  Because I have a feeling we're going to

14  hear this a lot.

15          THE COURT REPORTER:  I'm sorry, Judge, what are you

16  asking me?

17          MR. MITCHELL:  So, I was wondering whether you prefer

18  that I refer to the confidential source by the name

19  "confidential source," or would you prefer that I use the

20  initials C, as in Charlie, S, as in Sam; or, do you have no

21  preference?

22          THE COURT REPORTER:  No preference.

23          MR. MITCHELL:  Okay.  Thank you.

24          THE COURT:  Do whatever comes easily, Mr. Mitchell.

25  We understand, you know, whatever.

1          MR. MITCHELL:  Thank you, your Honor.

2   BY MR. MITCHELL:

3   Q.  So, the investigation involved the use of a confidential

4   source; is that right, Special Agent Daou?

5   A.  That's correct.

6   Q.  And I want to ask you about the background of the

7   confidential source.  Does the confidential source have a

8   prior criminal conviction?

9   A.  The source does.

10  Q.  And the criminal history includes convictions for violent

11  felonies; is that right?

12  A.  That's correct.

13  Q.  This confidential source has cooperated with the ATF-led

14  investigation since approximately May of 2018; is that right?

15  A.  That's correct.

16  Q.  And in May of 2018, law enforcement officers confronted

17  the confidential source with evidence of the confidential

18  source's narcotics trafficking, firearms offenses and money

19  laundering, and informed the confidential source that he was

20  likely to be charged federally; is that right?

21  A.  That's correct.

22  Q.  And since that time, the cooperating source has cooperated

23  with law enforcement in the hope of receiving consideration at

24  sentencing for those likely federal charges?

25  A.  That's correct.

1   Q.  And the confidential source has, in fact, been charged

2   federally and the charges are pending; is that right?

3   A.  That's correct.

4   Q.  During the course of his cooperation, the information the

5   cooperating source provided has been corroborated by recorded

6   calls and meetings, as well as controlled purchases of

7   narcotics; is that right?

8   A.  Correct.

9   Q.  So, I want to talk to you about three specific -- oh,

10   excuse me.

11         The cooperating source has also received some

12   compensation during the course of his cooperation; is that

13   right?

14   A.  That's correct.  The source has received approximately

15   $7,100 since the source began cooperating with ATF.

16   Q.  I now want to direct your attention to three dates of

17   September 19th, 2018; November 28th, 2018; and, January 4th,

18   2019.

19         So, first, let's focus on September 19th, 2018.

20   Special Agent Daou, on that date, did the confidential source

21   participate in a controlled purchase of heroin?

22   A.  That's correct.

23   Q.  So, I'm showing you what we've marked as Government

24   Exhibit 9-19-18 Report.

25         MR. MITCHELL:  That is a document that was provided

1    both to the Court and to defense counsel.

2         MR. TUNICK:  Judge, I'm going to object to the report

3    at this particular time.  That's a hearsay document.  We have

4    the agent's live testimony at this point.

5         THE COURT:  I'm going to overrule it only because

6    we're proceeding without the usual evidentiary rules in play

7    here.  But I certainly take the defense's point, and it will

8    go to weight.

9    BY MR. MITCHELL:

10   Q.  Special Agent Daou, do you recognize the document that

11   we've marked as Government Exhibit 9-19-18 report?

12   A.  I do.

13   Q.  And would you please tell the judge what that document is?

14   A.  It's a Chicago Police Department narcotics supplementary

15   report documenting the enforcement activities or investigative

16   activities that occurred on September 19, 2018, which was a

17   controlled purchase of heroin from Larry Jones.

18        MR. MITCHELL:  And, Judge, just for purposes of the

19   detention hearing, I move to admit this exhibit into evidence

20   just for your consideration as to the issue of detention.

21        THE COURT:  Yeah, for that limited purpose, the Court

22   will accept it, as I said, because we're not proceeding under

23   the evidentiary rules here.  It will be admitted just for the

24   Court's consideration for that limited purpose.

25        MR. MITCHELL:  Thank you, Judge.

1      (Government Exhibit 9-19-18 Report received in evidence.)

2   BY MR. MITCHELL:

3   Q.   So, Special Agent Daou, on September 19th, 2018, the

4   confidential source participated in recorded calls with Larry

5   Jones; and during those recorded calls, Jones and the

6   confidential source agreed to meet later that day on the 700

7   block of North Latrobe Avenue in Chicago; is that right?

8   A.   Correct.

9   Q.   And prior to the meeting, law enforcement officers met

10  with the confidential source; is that right?

11  A.   That's correct.

12  Q.   When they met with him, they searched the confidential

13  source and his vehicle to confirm that the confidential source

14  did not possess any narcotics or cash; is that right?

15  A.   Yes.

16  Q.   And after confirming that the confidential source and the

17  vehicle did not contain any narcotics or cash, did law

18  enforcement officers outfit the confidential source and the

19  confidential source's vehicle with audio and video recording

20  devices?

21  A.   We did.

22  Q.   And did the -- did law enforcement officers also provide

23  pre-recorded ATF funds to the confidential source?

24  A.   We did.

25  Q.   And it was approximately -- was it $1900 in funds?

1    A.   That's correct.

2    Q.   And why did law enforcement officers provide the

3    confidential source with $1,900 in pre-recorded ATF funds?

4    A.   Based on prior controlled purchases, that was the maximum

5    amount of money the source would need to purchase

6    approximately 25 grams of heroin from Larry Jones.

7    Q.   And, so, the understanding was that the confidential

8    source was going to meet with Larry Jones and purchase

9    approximately 25 grams of heroin; is that right?

10   A.   That's correct.

11   Q.   And did law enforcement officers also direct the

12   confidential source to bring up the topic of purchasing a

13   firearm from Jones?

14   A.   That's correct.

15   Q.   So, after meeting with the confidential source, did law

16   enforcement officers then maintain surveillance of the

17   confidential source as he traveled to the 700 block of North

18   Latrobe?

19   A.   We did.

20   Q.   Were there other law enforcement officers who were

21   actually in the area of the 700 block of North Latrobe on the

22   afternoon of September 19, 2018?

23   A.   There were.

24   Q.   And they were conducting surveillance at that time; is

25   that right?

1    A.   Yes.

2    Q.   And at approximately 5:39 p.m., law enforcement officers

3    observed the confidential source arrive in his vehicle on the

4    700 block of North Latrobe; is that right?

5    A.   Correct.

6    Q.   And law enforcement officers observed the confidential

7    source park his car behind a blue Chevrolet Impala?

8              MR. TUNICK:  Judge, I'm going to have to object.

9    This is clearly leading.  All the witness is answering is

10   "correct" at this point.

11             MR. MITCHELL:  You know, Judge, I'm happy to not

12   lead.  I just was trying to move it along.  But I'm happy to,

13   you know, if the Court prefers -- as you stated earlier, your

14   Honor, the rules of evidence really are not in play here.  So,

15   I was trying to keep it moving.  Whatever the Court's

16   preference is.

17             THE COURT:  I was on mute just so everyone can hear

18   better.

19             That is right.  The evidentiary rules are not in play

20   here.

21             But I would prefer, based on the objection, Mr.

22   Mitchell, you try to lead less.  And, frankly, it will

23   help weight, in my view.  So, I would ask you to rephrase, to

24   not lead.

25             MR. MITCHELL:  Understood, Judge.

BY MR. MITCHELL:

Q.   So, while conducting surveillance on the 700 block of
North Latrobe, did law enforcement officers observe another
vehicle on that block?

A.   Yes.  As the source's vehicle arrived on the 700 block of
Latrobe, surveillance officers had observed a vehicle, a blue
Chevy Impala bearing the license plate of L746999, which we
had previously seen on surveillance and reg- -- it was
registered to Larry Jones.  And we knew Larry Jones to drive
that vehicle.

When the source arrived on the -- on the -- 700
block, surveillance officers observed Larry Jones exit the
driver's seat of the vehicle, and he entered the front
passenger seat of the source's vehicle.

Q.   You testified earlier that the confidential source and his
vehicle were outfitted with audio/video recording devices; is
that right?

A.   That's correct.

Q.   And have you had an opportunity to review the audio and
video from the recording devices on that date?

A.   I have.

Q.   Based on your review of the video, what, if anything, did
the confidential source hand to Jones during that meeting
inside the confidential source's vehicle?

A.   He handed Larry Jones the pre-recorded ATF funds, which

1  were provided to him before leaving the predetermined meet

2  location, and Larry Jones then handed the source an object

3  which was later determined to be heroin.

4  Q.  And you testified earlier that the law enforcement

5  officers directed the confidential source to ask Jones about

6  obtaining a firearm; is that right?

7  A.  That's correct.

8  Q.  And based on your review of the audio and video recording

9  from the meeting on September 19th, did the confidential

10  source and Jones, in fact, discuss firearms?

11  A.  They did.  After reviewing the recordings, it can be heard

12  the source telling Larry Jones he needed a thing, which we

13  understood to be a firearm based off of what the discussion

14  with the source after the transaction.

15        Further review of the video, you can hear that Larry

16  Jones said something along the lines of how the source wanted

17  something big and nice.  And the source replied, "Doesn't need

18  to be nice and big or anything."  And Jones stated he had a

19  .38 or a .380 he could give the source.  And the source said

20  he would like a 9 millimeter or .40-caliber pistol and said he

21  would wait for one of those.

22        He also informed Larry Jones he didn't just want to

23  borrow a firearm; he wanted to purchase one to keep because he

24  needed one for protection.

25  Q.  And I -- excuse me one second.

1    During the -- at the conclusion of the -- at some

2    point, did Larry Jones exit the front passenger seat of the

3    confidential source's vehicle?

4    A.  He did.  After the narcotics transaction was concluded and

5    after they had had that brief discussion about the firearm,

6    Larry Jones left the source's vehicle and began walking toward

7    his own vehicle, the Chevy Impala.

8         As Larry Jones was entering his vehicle, the source

9    started driving away and then pulled up to Larry Jones, rolled

10   his window down and informed Mr. Jones that he would be

11   willing to go with him -- with Larry Jones -- to purchase the

12   firearm whenever the shipment came in.

13        And Larry Jones said something along the lines of

14   he's been calling trying to get them; he'll let the source

15   know when the firearms arrive.

16        And as the source is parked alongside of Larry Jones'

17   vehicle, it can be seen in the video that there's a female in

18   the front passenger seat of Larry Jones' vehicle as they're

19   having this discussion.

20   Q.  Let me interrupt you for a second, Special Agent Daou.

21   So, I want to just back up a second and ask you about that.

22        So, there was -- was there anyone in the Chevy Impala

23   that Larry Jones had arrived on the 700 block of Latrobe in?

24   A.  There was.

25   Q.  And was there more than one person -- so, was there -- was

1 there Larry Jones and one other person or multiple people?

2 A.  Based off of what surveillance officers saw and what can

3 be seen in the video, it appeared to be only one other person.

4 Q.  And was that other person a male or a female?

5 A.  It was a female.

6 Q.  Have you -- were you and other law enforcement officers

7 able to identify who that female was?

8 A.  I -- I was able to identify her.

9 Q.  And who was it?

10 A.  It was Shanesha Houston, Larry Jones' girlfriend,

11 according to the source.

12 Q.  How were you able to identify that that person was

13 Shanesha Houston?

14 A.  Based off a comparison of the recorded video from that

15 controlled purchase and comparison of Shanesha Houston's

16 Illinois driver's license photo.

17 Q.  And you testified a moment ago just in summary fashion

18 about the conversations between the confidential source and

19 Larry Jones regarding the firearm; is that right?

20 A.  Correct.

21 Q.  And part of that conversation, was that -- that took place

22 out -- while Larry Jones was outside the vehicle; is that

23 right?

24 A.  That's correct.

25 Q.  And was any part of the conversation, did any part of the

1  conversation take place in front of Shanesha Houston, based on

2  your review of the recording from this date?

3  A.  Yes.  The very end of it, before the source drove away

4  from that area, when the source mentioned that he would go

5  with Larry Jones to purchase the firearms whenever the

6  shipment arrived.

7  Q.  Did the -- after this --

8      MR. TUNICK:  I'm going to object.  Could we

9  actually -- since the agent has apparently reviewed this,

10  could we actually get the actual words that were purportedly

11  used?

12  BY MR. MITCHELL:

13  Q.  Special Agent Daou, do you recall the specific words that

14  were used during the back-and-forth between Larry Jones and

15  the confidential source during this meeting?

16  A.  I don't remember it verbatim, no.

17  Q.  And is it true that on or about May 15th, 2019, you signed

18  an affidavit that was submitted in support of an application

19  for a wire on a phone used by Larry Jones?

20  A.  I did.

21  Q.  And would it refresh your recollection to take a look at

22  the -- that affidavit that you prepared on or about that date?

23  A.  It would.

24      MR. MITCHELL:  And, so, your Honor, the application

25  and affidavit is -- a redacted copy of it was provided to

1    defense counsel prior to the hearing actually yesterday.  And

2    I'm showing Special Agent Daou a copy of that affidavit now.

3              THE COURT:  Okay.

4    BY MR. MITCHELL:

5    Q.  Special Agent Daou, based on your reviewing this

6    affidavit, I want to ask you some questions about the

7    back-and-forth between Larry Jones and the CI regarding this

8    purported firearms transaction?

9              MR. TUNICK:  Just for the record, I was just

10   referring to the time when the agent says that the source was

11   within earshot of Ms. Houston, actually.  I was referring to

12   that particular conversation.  I didn't mean to get into

13   everything.

14             MR. MITCHELL:  Okay.

15             THE COURT:  It's up to you, Mr. Mitchell, what you

16   want to present.  If there's a relevance objection, I'll take

17   it at that point.

18             Right now he's just refreshing his recollection, and

19   we'll see what comes of that.

20   BY MR. MITCHELL:

21   Q.  During that back and forth, was there -- what, if

22   anything, did the confidential source say to Larry Jones

23   regarding the firearm?

24   A.  He said that, "Bro, I need a firearm or I need a thing,"

25   which we understood to mean a firearm.

1  Q.  And what, if anything, did Jones say in response?

2  A.  "You remember saying he wanted something nice and big,"

3  which was in reference to a prior recorded conversation the

4  source had with Jones.

5  Q.  And in response, what, if anything, did the confidential

6  source say?

7  A.  The source stated, "I don't want nothing nice and big."

8  Q.  And what, if anything, did Jones say in response to that

9  from the confidential source?

10  A.  Larry Jones stated, "I got a .38, a little .380," which I

11  understood to mean a .38-caliber revolver or .380-caliber

12  pistol.

13       He also said, "You said you need a 9 or 40 or

14  something," which I understood to be a 9-millimeter pistol or

15  a .40-caliber pistol.

16       And Mr. Jones said, "I'm trying to wait until I can

17  get you one of those.  So, that's what I'm going to do.  I'm

18  going to get you one --" a firearm is what he was referencing

19  as one "-- and you can hold it until Friday or so."

20  Q.  And what, if anything, did the confidential source say in

21  response to that?

22  A.  The source stated, "I may have to take that or something.

23  I need something.  I ain't got nothing, bro."

24  Q.  And based on your training and experience, what did you

25  understand that to mean?

1   A.   The source did not have a gun and he needed one to carry

2   on his person.

3   Q.   And what, if anything, did Jones say in response to that?

4   A.   "All right.  I'll make it happen, bro."

5   Q.   And after that, there was an additional conversation; is

6   that right?

7   A.   There was.

8   Q.   And you summarized the conversation earlier.  You don't

9   have an exact quote of that in front of you; is that right?

10  A.   I do not.

11  Q.   In summary, what was the gist -- in summary, what was the

12  conversation that took place after this portion of the

13  conversation?

14  A.   The source stated he would go with Larry Jones to pay for

15  it whenever the shipment --

16         MR. TUNICK:  I'm going to object.  I'm going to

17  object here.  The document was used to refresh recollection.

18  That's where we were.  He doesn't have any independent

19  recollection even after this document was given to him.  We

20  are refreshing recollection.  So, this would be improper.

21         MR. MITCHELL:  Judge, may I respond?

22         THE COURT:  Sure.  Go ahead.

23         MR. MITCHELL:  I think there's a misunderstanding

24  because the witness is, in fact, testifying based on his

25  recollection of the recording from September 19th, 2018.  His

1   recollection -- and he just summarized what the -- well, first

2   of all, he provided direct quotations from the back and forth.

3   But there's additional information that is not a direct quote,

4   but is based on his recollection of the video itself.  So --

5        MR. TUNICK:  Which he already testified to.  And, so,

6   that would be asked and answered.

7        And we're at the point of just refreshing his

8   recollection as to the specific words that were used in

9   earshot of Ms. Houston.  He has no recollection; the document

10  doesn't provide him any recollection; and, he's already

11  testified to it.  So, I don't understand where we're going at

12  that point with that.

13       THE COURT:  Okay.  Well, the document doesn't have to

14  have the exact words.

15       I think, Mr. Mitchell, you just need to see if this

16  document has refreshed the witness' recollection about the

17  subsequent conversation.  He can either say "No" or "Yes" and

18  then he can go on with it.  And in any event, this is all

19  going to go to weight.  So --

20       MR. MITCHELL:  Right, your Honor.

21       So, if the objection is to the conversation that took

22  place after Jones exited the car, the witness has testified

23  about his recollection about that, about that --

24       MR. TUNICK:  Yes.

25       MR. MITCHELL:  -- conversa- --

1    MR. TUNICK:  Yes.

2    MR. MITCHELL:  So --

3  BY MR. MITCHELL:

4  Q.  After the conversation concluded, did the confidential

5  source then drive away from the area?

6  A.  Yes.

7  Q.  And what -- did law enforcement maintain surveillance of

8  the confidential source as he did so?

9  A.  We did.

10  Q.  Where did he drive next?

11  A.  Law enforcement surveillance maintained eyes and we

12  followed the source to a predetermined meet location where we

13  met with the source.  At that time, the source handed to us

14  the object -- the tan, chunky substance -- which was in a

15  plastic bag, which was tendered to the source from Larry

16  Jones.  And the source also returned any unused pre-recorded

17  funds.

18    After we took the contraband and the pre-recorded

19  funds into our custody, we searched the source for any other

20  contraband or money and found none.  We also searched the

21  source's vehicle and found no contraband or funds.  And, then,

22  we recovered our covert recording devices and turned them off.

23  Q.  And the substance that the CI had -- the confidential

24  source had -- received from Larry Jones, was that subsequently

25  lab tested?

1  A.  It was.

2  Q.  And what were the results of those tests?

3  A.  It came back as testing positive for heroin.

4  Q.  And approximately how much did it weigh?

5  A.  Approximately 25 grams.

6  Q.  When law enforcement met with the confidential source

7  after this meeting, did they also remove the recording devices

8  that they had outfitted him with?

9  A.  We had.

10  Q.  Did law enforcement officers also speak with the

11  confidential source about what had occurred during that

12  meeting?

13  A.  We did.

14  Q.  And did the confidential source -- what did the

15  confidential source -- what, if anything, did the confidential

16  source say regarding a conversation about firearms?

17  A.  The source stated he had discussion about --

18          THE COURT REPORTER:  I'm sorry, can you please repeat

19  that?  I didn't hear that.  Please repeat.

20  BY THE WITNESS:

21  A.  The source had a conversation with Larry Jones after they

22  conducted a narcotics transaction and inquired from Larry

23  Jones if the source could purchase a firearm from Larry Jones.

24  And the source informed -- or Larry Jones informed the source

25  that he didn't have any right now and he would work on

1  obtaining one.

2  BY MR. MITCHELL:

3  Q.  What, if anything, did the confidential source tell law

4  enforcement about whether Larry Jones was accompanied by

5  anyone else at the time of this meeting on the 700 block of

6  North Latrobe?

7  A.  We had asked the source what was discussed when he pulled

8  up next to Larry Jones' vehicle.  And he said he was just

9  continuing the conversation about the firearm.  And he also

10  mentioned that Larry Jones' girlfriend was -- that he spoke

11  with Larry Jones' girlfriend, who was seated in the front

12  passenger seat.

13  Q.  And based on your review of the video again, that was the

14  individual you've identified as, who?

15  A.  We identified that individual as Shinesha Houston.

16  Q.  I want to now direct your attention to November 28, 2019.

17  On that date, did the confidential source, again, participate

18  in a recorded call with Larry Jones?

19  A.  The source did.

20  Q.  And the phone that Larry Jones was using at that time,

21  that was identified as -- we refer to that as Target Phone 11;

22  is that right?

23  A.  That's correct.

24  Q.  And that phone was later the subject of a wiretap; is that

25  right?

1    A.   That is correct.

2    Q.   And how did you and other law enforcement officers

3    determine that Larry Jones was the user of Target Phone 11?

4    A.   Based off of recorded phone calls with that phone number

5    and comparison to the voice of Larry Jones from prior

6    controlled purchases that were audio and video recorded.

7    Q.   And during a call -- a recorded call -- on November 28,

8    2019, did the confidential source and Larry Jones again

9    discuss firearms?

10   A.   They did.

11   Q.   And, again, do you recall the exact words that they used

12   during that recorded call?

13   A.   I do not.

14   Q.   Would it refresh your recollection to review your May 15,

15   2019, affidavit?

16   A.   It would.

17   Q.   During that call, what, if anything, did the confidential

18   source say to Larry Jones about firearms?

19   A.   During the call, the source stated, "I'm naked.  I'm still

20   naked."

21   Q.   And in your previous experience and your knowledge of the

22   investigation, what did you understand that to mean?

23   A.   That the source was still trying purchase a firearm and

24   needed a firearm for protection.

25            THE COURT REPORTER:  I'm sorry, please repeat, Agent.

1  BY THE WITNESS:

2  A.  I understood it to mean that the source still wanted to

3  purchase a firearm, he needed a firearm, and he needed it for

4  protection.

5  BY MR. MITCHELL:

6  Q.  What, if anything, did Larry Jones say in response?

7  A.  Mr. Jones stated, "My next one that I come up on, I want

8  to make sure you take that one, too, then."

9  Q.  And based on your training and experience and knowledge of

10  the investigation, what did you understand that to mean?

11  A.  That the next firearm Larry Jones had, he would sell to

12  the source as soon as possible.

13  Q.  And later in that conversation, did Jones provide

14  additional information about firearms?

15  A.  He did.  He stated that, "He had some bullshit.  I don't

16  want to give you no bullshit."

17  Q.  Based on your training and experience and knowledge of the

18  investigation, what did you understand that to mean?

19  A.  That Larry Jones did not want to provide the source with a

20  firearm that would not operate properly.  He wanted to give

21  him a high quality one that would be -- would fire when

22  needed.

23  Q.  What, if anything, did the confidential source say in

24  response to that?

25  A.  "Hell no."

1    Q.  And what, if anything, did Jones say after that?

2    A.  Larry Jones stated, "I want it to be right."

3    Q.  And what did you understand that to mean, based on your

4    training and experience and knowledge of the investigation?

5    A.  That Larry Jones wanted to ensure the source had a

6    high-quality firearm, especially if he needed it for

7    protection.

8    Q.  Finally, I want to direct your attention to January 4th,

9    2019.  On that date -- on or about that date, did the

10   confidential source receive a photograph by text message from

11   Target Phone 11, which you testified moments ago was a phone

12   used by Larry Jones?

13   A.  That's correct.

14   Q.  And what was depicted in that photograph?

15   A.  The source showed me the telephone, and there was a

16   photograph of five firearms which appear to be laid on a bed

17   or a bedspread of some sort.

18   Q.  I'm showing you, Special Agent Daou, what we've marked as

19   Exhibit 1-4-19 Photo.

20           Do you recognize that?

21   A.  I do.

22   Q.  What is it?

23   A.  That's the photograph the source had received on the

24   source's cellular phone.

25           THE COURT REPORTER:  I'm sorry, please repeat, Agent.

1   I didn't hear that.

2   BY THE WITNESS:

3   A.   It depicts a photograph that the source had received on

4   the source's cellular phone.

5   BY MR. MITCHELL:

6   Q.   And the photograph depicts, what?

7   A.   The photograph depicts five firearms -- four semiautomatic

8   pistols and one revolver -- laying on top of what appears to

9   be a bed or bedspread.

10       MR. MITCHELL:  Your Honor, again, just for purposes

11   of the detention hearing, move to admit Exhibit 1-4-19 Photo

12   into evidence for your consideration.

13       THE COURT:  For that limited purpose, that's fine.

14   So admitted.

15     (Government Exhibit 1-4-19 Photo received in evidence.)

16   BY MR. MITCHELL:

17   Q.   Special Agent Daou, did the firearms transaction that

18   Larry Jones and the confidential source had discussed ever, in

19   fact, take place?

20   A.   No, it did not.

21       MR. MITCHELL:  Your Honor, no further questions for

22   Special Agent Daou.

23       THE COURT:  Okay.

24       Mr. Tunick?

25       MR. TUNICK:  Thank you, your Honor.

1                              CROSS-EXAMINATION

2    BY MR. TUNICK:

3    Q.   Agent, September 2018, you had this confidential source

4    signed up with the ATF, correct?

5    A.   Correct.

6    Q.   And the source has numerous violent felonies, correct?

7    A.   Correct.

8    Q.   He currently has a pending firearms case, correct?

9    A.   Correct.

10   Q.   You paid him thousands of dollars, correct?

11   A.   Correct.

12   Q.   And he was recorded on wiretap on four of his phones,

13   correct?

14   A.   I -- I can -- I don't understand the question.

15   Q.   You had -- you had wiretapped the source's phones prior to

16   his cooperation, correct?

17   A.   We had.  I can't comment on how many of his phones,

18   though.  I was not the affiant.

19   Q.   Do you know how many violent felonies the source had?

20            MR. MITCHELL:  Objection, your Honor.  And only

21   because trying to maintain the confidentiality of the

22   confidential source's identity.

23            THE COURT:  Just because -- I'm going to sustain the

24   objection.  But I understand the --

25            MR. TUNICK:  That's fine, Judge.  I'll move on.

1        THE COURT:  -- defendant's point.

2        Okay.  That's fine.

3        MR. TUNICK:  That's fine, Judge.

4    BY MR. TUNICK:

5    Q.  Okay.  So, in September 2018, ATF directed the source to

6    engage in conversations with Mr. Jones about purchasing a

7    firearm, true?

8    A.  Correct.

9    Q.  And he did this at the direction of the agents, correct?

10   A.  Correct.

11   Q.  So, on September 19, 2018, he approaches Jones and he

12   says, "I need something, bro," correct?

13   A.  Correct.

14   Q.  And Jones says he doesn't have any guns, right?

15   A.  That's correct.

16   Q.  So -- and, then, September goes by -- and October -- and

17   there's no discussions about guns, correct?

18   A.  Not that I recall.

19   Q.  And, then, we get to November.  And ATF still wants to try

20   and purchase a gun from Jones, correct?

21   A.  Yes.

22   Q.  So, they direct the source, again, to engage in

23   conversations with him again, correct?

24   A.  I don't recall if we directed him or if the source did it

25   on the source's own.

1  Q.  The source would act on its own in certain -- you didn't

2  brief the source before his meeting -- or his conversations

3  with Mr. Jones?

4  A.  The source knew that we would like to purchase a firearm

5  from Larry Jones.

6  Q.  Okay.

7       So, then in -- so, now we get to November, late

8  November and November 28th, and the source again tries to get

9  Jones to sell him a firearm, correct?

10 A.  Yes.

11 Q.  And he says, "Hey, man, I'm naked.  I'm still naked,"

12 right?

13 A.  Correct.

14 Q.  And Jones says, "Well, you know, man, I don't want to give

15 you a bad gun," right?

16 A.  Correct.

17 Q.  That's the same thing he said in September, right, when he

18 didn't have any guns, correct?

19 A.  Not exactly, no.

20 Q.  Well, he did say something to that effect, right, like,

21 "Hey, man, I want to hook you up with a good one," right?  You

22 know -- didn't he say that in September?  You testified to

23 that.

24 A.  Mr. Jones stated he had a .38 or .380, but Jones -- Larry

25 Jones -- indicated he believed the source wanted a

1    9-millimeter or .40-caliber pistol.

2    Q.  Okay.

3           By the way, that's not in your report at all or the

4    report that was tendered to the Court.  There is nothing about

5    a .380 in that report or any of that discussion; isn't that

6    true?

7           MR. MITCHELL:  Objection, your Honor.  The affidavit

8    in support of the May 15, 2019 --

9           MR. TUNICK:  Judge, Judge, that was used to refresh

10   recollection.  They tendered the police report as an exhibit.

11   The affidavit is not tendered.  I'm crossing about the exhibit

12   that they produced.

13          THE COURT:  Okay.  Let me take it one line at a time

14   here, one at a time.  The objection is that -- essentially,

15   that the report to which Mr. Tunick is referring is not the

16   agent's report, right?  That's the essence of the objection?

17      (No response.)

18          THE COURT:  Mr. Mitchell, are you there?

19          MR. MITCHELL:  Yeah.  So, the -- I'm not sure -- the

20   objection -- my understanding of the objection is that --

21   maybe Mr. Tunick can explain his objection, but I'll just

22   leave it at that.

23          My understanding --

24          MR. TUNICK:  My object- --

25          MR. MITCHELL:  I guess my understanding was that he

1  was objecting that he didn't have notice of the quotes that

2  were included in the wire affidavit that were, in fact,

3  produced to him.

4          THE COURT:  Well, let's start -- Mr. Tunick is

5  crossing the agent.

6          Mr. Mitchell, restate your objection.

7          MR. MITCHELL:  Oh, excuse me.

8          So, my objection is to the statement that, you know,

9  the information that the quotes that Special Agent Daou

10  testified to weren't included in a report.

11          MR. TUNICK:  I'm --

12          THE COURT:  I'm going to overrule it, and the agent

13  can answer.

14          Mr. Tunick, restate your question or if you'll just

15  repeat it, and the agent can answer how he's going to answer.

16          I believe the question was, Agent, why aren't these

17  things in your report that stated --

18          MR. TUNICK:  I'm actually going to rephrase it, your

19  Honor.

20          THE COURT:  Good.  That's fine.

21  BY MR. TUNICK:

22  Q.  The report -- this CPD report -- that you reviewed that

23  was tendered to the Court doesn't make any mention of a .380

24  caliber, correct?

25  A.  That is correct.

1   Q.  And it doesn't make any mention of any other type of guns

2   that Jones purportedly wanted to sell, correct?

3   A.  Correct.

4   Q.  Okay.

5           Now -- so, in November, they don't even negotiate a

6   price, correct?

7   A.  Correct.

8   Q.  They don't negotiate a particular gun, correct?

9   A.  That's correct.

10  Q.  And, again, it seems as if Mr. Jones doesn't have a gun

11  because he says, "Well, as soon as I get one, I'll hook you

12  up," right?

13  A.  Correct.

14  Q.  Okay.

15          So, then in December, nothing happens with respect to

16  an attempt to buy a gun from Mr. Jones, correct?

17  A.  Correct.

18  Q.  And -- but ATF would still like to see a gun purchased by

19  the source from Mr. Jones, true?

20  A.  That's true.

21  Q.  Did they engage in further discussions with him -- with

22  Mr. Jones -- in order to try and get him to sell a gun?

23  A.  No.

24  Q.  Okay.

25          Now, in January of 2019, a photograph was purportedly

1  sent to the source's phone, true?

2  A.  Correct.

3  Q.  There wasn't any discussion about, hey, do you want to

4  purchase this gun, correct?

5  A.  That's correct.

6  Q.  Nothing about, hey, this gun is so-and-so dollars,

7  correct?

8  A.  That is correct.

9  Q.  I have this gun for you, correct?  He didn't say anything

10  like that, did he?

11  A.  No.

12  Q.  He didn't say a single word about selling guns to the

13  source with that photograph, true?

14  A.  That's correct.

15  Q.  Now, you don't even know who took that photograph, true?

16  A.  Who took it, no.

17  Q.  You don't know where it was taken, correct?

18  A.  That is correct.

19  Q.  You don't know when it was taken, correct?

20  A.  I do know when it was taken.

21  Q.  Okay.  When was it taken?

22  A.  January 4th, 2019, at 8:30 a.m.

23  Q.  Okay.

24        And it's fair to say, though, you don't know that

25  Mr. Jones took that photograph, correct?

1    A.   At this time, I can't say that he did.

2    Q.   Well, if you don't have evidence that he took that

3    photograph, it's a fair statement to say there's no evidence

4    in your possession that Mr. Jones took that photograph, true?

5    A.   At this time, that's correct.

6    Q.   At some point, you gave up -- the ATF gave up -- trying to

7    purchase a gun from Mr. Jones through the source, correct?

8    A.   No, that's not correct.

9    Q.   Well, in February 2019, the source was still trying to

10   contact Mr. Jones, correct?

11   A.   Yes.

12   Q.   But efforts to purchase a gun basically failed at that

13   point, correct?

14   A.   No.

15   Q.   Well, in your affidavit, you basically said you were going

16   to stop those efforts at this time for various reasons, true?

17   A.   I don't believe that's correct.

18   Q.   What does your affidavit say about -- let me, if I

19   might -- I have to pull up the affidavit.

20        MR. TUNICK:  I'm going to move on and get back to

21   that because the actual affidavit itself is on my computer.

22   BY MR. TUNICK:

23   Q.   Now, during the course of this investigation, there were

24   times when Mr. Jones was actually stopped in his vehicle,

25   correct?

1   A.   Yes.

2   Q.   And during those times, he actually gave consent to search

3   his vehicle; did he not?

4   A.   I don't recall that, no.

5   Q.   Well, okay.

6        Was his vehicle searched?

7   A.   During this investigation, I'd have to -- I don't remember

8   if it was ever searched, no.

9   Q.   Okay.  Well, during those traffic stops that were made, no

10  weapons were discovered on Mr. Jones, true?

11  A.   No, there was never a weapon discovered on Mr. Jones.

12  Q.   Okay.

13       Now, did the conversation that occurred purportedly

14  within the earshot of Ms. Houston, the source didn't use the

15  word "firearm," did he?

16  A.   The source did not.

17  Q.   He didn't use the word "gun," did he?

18  A.   No.

19  Q.   They were keeping that conversation discreet; were they

20  not?

21  A.   It was discreet.  I don't know if that was their intention

22  or not.

23  Q.   Okay.

24       Well, the conversation was discreet that was --

25  A.   Yes.

 1  Q.  And, so, over the course from September of 2019 all the

 2  way -- or 2018 -- all the way to February -- well, when --

 3          MR. TUNICK:  Strike that.

 4  BY MR. TUNICK:

 5  Q.  When did the source stop actively cooperating on the

 6  street?

 7  A.  The source did not stop actively cooperating.

 8  Q.  Okay.

 9          So, to this day it's a fair statement to say the

10  source has never purchased a firearm from Mr. Jones, correct?

11  A.  That's correct.

12  Q.  And you have no other sources that have ever purchased a

13  firearm from Mr. Jones, correct?

14  A.  That's correct.

15          MR. TUNICK:  I have nothing further, Judge.

16          THE COURT:  Okay.  Thank you.

17          Mr. Mitchell?

18          MR. MITCHELL:  Just a couple of things, your Honor.

19                  REDIRECT EXAMINATION

20  BY MR. MITCHELL:

21  Q.  So, there were questions about the report that was

22  submitted or turned over prior to the hearing today.  Do you

23  remember those questions?

24  A.  I do.

25  Q.  And who prepared that report?

1  A.  CPD Officer Michael Galligan.

2  Q.  And during your direct testimony, you were provided with a

3  copy of your affidavit -- May 15th, 2019, affidavit; is that

4  right?

5  A.  That's correct.

6  Q.  And that's the document that has some summaries from the

7  recordings of the transaction that took place on September

8  19th, 2018; is that right?

9  A.  Yes.  The CPD report was based off of summary and after a

10  cursory review of the videos.  The affidavit that I drafted

11  for the Title III affidavit, I reviewed the video thoroughly

12  and took direct quotes from that.

13  Q.  And during the meeting between the confidential source and

14  Larry Jones on September 19th, 2018, Larry Jones did, in fact,

15  state that he had firearms, right?

16  A.  That is correct.

17  Q.  And he specifically said, "I got a .38, a little .380"; is

18  that right?

19  A.  That's what was from the video, yes.

20      MR. MITCHELL:  No further questions, your Honor.

21      THE COURT:  Okay.

22      Mr. Tunick, any recross?

23      MR. TUNICK:  Judge, I'm just trying to pull up the

24  affidavit itself.  Give me one second.

25      THE COURT:  Take your time.  This is all working in

1    difficult circumstances.  So, please take your time.

2                    RECROSS EXAMINATION

3    BY MR. TUNICK:

4    Q.  So, Agent, the source told Mr. Jones, "I may have to take

5    that or something.  I need something.  I ain't got nothing."

6    And that was -- but nothing still was sold to the source,

7    correct?

8    A.  That's correct because Larry Jones, according to the

9    source --

10   Q.  No, no, I asked you nothing was sold to the source.  I

11   don't want more explanations why.

12              Nothing was sold to the source, correct?

13   A.  Correct.

14   Q.  Even despite the fact that he said he'll take anything,

15   correct?

16              "I ain't got nothing.  I need something," right?

17   A.  That's what the source said, correct.

18              MR. TUNICK:  Nothing further, Judge.

19              THE COURT:  Mr. Mitchell, any follow-up?

20              MR. MITCHELL:  Nothing, your Honor.  Thank you.

21              THE COURT:  Thank you, Agent.

22              THE WITNESS:  Thank you, ma'am.

23              MR. WALKER:  Judge, this is Grayson Walker.

24              The government now calls Thomas Sheehan.

25              THE COURT:  Okay.  Great.

1          Agent Sheehan, can you please raise your right hand.

2          THE WITNESS:  Yes, I am raising my right hand right

3    now.

4          THE COURT:  Thank you, Agent.

5          Can you please state your name and spell it for the

6    record.

7          THE WITNESS:  Thomas Sheehan.  T-h-o-m-a-s,

8    S-h-e-e-h-a-n.

9          THE COURT:  And what agency do you work for?

10          THE WITNESS:  The Bureau of Alcohol, Tobacco,

11   Firearms & Explosives.

12      (Witness sworn.)

13          THE COURT:  Mr. Walker, you can proceed.

14          THOMAS SHEEHAN, PLAINTIFF'S WITNESS, SWORN

15                    DIRECT EXAMINATION

16   BY MR. WALKER:

17   Q.  Special Agent Sheehan, you mentioned a moment ago you work

18   for ATF, correct?

19   A.  Yes, sir.

20   Q.  What is your position at ATF?

21   A.  I'm a special agent.

22   Q.  How long have you held the position of ATF special agent?

23   A.  Five years.

24   Q.  And before assuming your current position with ATF, did

25   you have any prior employment in law enforcement?

1  A.  Yes.  I was a police officer for the Metropolitan Police

2  Department in Washington, D.C., for almost nine years.

3  Q.  In total, approximately how long have you worked in law

4  enforcement?

5  A.  Almost 17 years now.

6  Q.  As part of your current job duties with the ATF, do you

7  participate in the execution of arrest warrants?

8  A.  Yes, sir.

9  Q.  Have you received training on how to execute arrest

10 warrants?

11 A.  Yes, sir, at the ATF academy at FLETC and quarterly

12 training here in the Chicago Field Division.

13 Q.  And in your career with ATF, approximately how many arrest

14 warrants have you executed?

15 A.  With ATF, a dozen I would say.

16 Q.  I want to direct your attention to June 25th of 2020.  So,

17 last week.  What was your assignment on June 25th?

18 A.  I was on-scene commander at 2325 South 25th Avenue in

19 Broadview, Illinois.

20 Q.  What was your specific assignment as scene commander at

21 that location?

22 A.  To manage the -- executing the arrest for Mr. Larry Jones.

23 Q.  Approximately how many law enforcement officers were

24 assigned to the team executing this arrest warrant on Larry

25 Jones?

1   A.  Myself, two other special agents, three TFOs -- ATF task

2   force officers -- who are from Chicago Police Department, two

3   Chicago police detectives, and three other Chicago police

4   officers assigned to narcotics.

5   Q.  Now, before June 25th, had law enforcement identified the

6   address that you mentioned a moment ago, 2325 South 25th

7   Avenue in Broadview, as the address where Larry Jones was

8   living?

9   A.  Yes.

10   Q.  How was that address identified as Jones' residence?

11   A.  Through physical surveillance.

12   Q.  Can you just explain in layman's terms what you mean by

13   physical surveillance?

14   A.  Law enforcement officers physically observed Mr. Jones,

15   the defendant, at that location specifically on at least --

16   the earliest of that surveillance was June 22nd, 2020.

17   Q.  So, approximately three days before his arrest?

18   A.  Yes, sir.

19   Q.  Now, on the morning of June 25th, did you conduct any

20   surveillance at that target residence for Jones?

21   A.  Yes.  I sat in front of that residence for approximately

22   30 minutes prior to the execution of the arrest warrant.

23   Q.  So, approximately what time did you establish

24   surveillance?

25   A.  5:30 a.m.

1  Q.  What did you observe after you had established

2  surveillance there?

3  A.  So, prior to -- the information I received was Mr. Jones

4  was known to drive a Nissan SUV, possibly a Nissan Rogue SUV,

5  and he parks it in the rear of that address of 2325 South 25th

6  Avenue in Broadview, Illinois.  When I set up my physical

7  surveillance, I observed that -- a Nissan SUV matching that

8  description parked in the rear of that residence.

9  Q.  You mentioned a second ago that you had received

10  information about Mr. Jones driving that Nissan SUV.  Can you

11  explain where you obtained that information from?

12  A.  From a task force officer.  It's Chicago Police Officer

13  Cowie, C-o-w-i-e.

14  Q.  And what did that task force officer tell you specifically

15  about a Nissan SUV?

16  A.  She observed it -- in the morning of the 22nd, observed

17  Mr. Jones park that vehicle in the rear and go inside the

18  residence.

19  Q.  Now, on June 25th, was Mr. Jones arrested inside that

20  residence in Broadview, Illinois?

21  A.  Yes, he was.

22  Q.  Approximately what time did the arrest take place?

23  A.  6:00 a.m.

24  Q.  How did law enforcement make entry into the residence that

25  morning?

1  A.   Forced entry through the main entry door from the
2  residence.
3  Q.   Did a team of law enforcement officers knock and announce
4  before making entry?
5  A.   Yes.   Specifically, Special Agent Hultgren knocked on the
6  residence and announced that police had a warrant.
7  Q.   Approximately how many law enforcement officers were part
8  of that entry team?
9  A.   Approximately five.
10 Q.   Were you personally part of that entry team of five
11 officers?
12 A.   I was on the outside because I was managing the scene.
13 But I did -- I never made entry until the residence was clear
14 of all parties, but I was on the outside looking in through
15 the main entry door, yes.
16 Q.   Have you talked with members of the entry team about what
17 happened after they knocked and announced?
18 A.   Yes, I have.
19 Q.   And based on those conversations, after the knock and
20 announce, did anyone answer the door?
21 A.   No one answered the door.   We then forced entry on that
22 main entry door.   We encountered a pit bull.   A taser was
23 deployed, but it missed the pit bull.   And, then, the
24 defendant's girlfriend came -- or wife came -- and restrained
25 the pit bull and brought him up to their minor son's room.

1  After that --

2  Q.  When you -- sorry.

3       Let me ask you, you made reference a second ago to

4  the defendant's girlfriend or wife.  Has that person been

5  identified by name?

6  A.  Yes.  It escapes me right now.  I'm having a moment.  I'm

7  sorry.

8  Q.  Does the name Shinesha Houston refresh your recollection?

9  A.  Yes.  Sorry.  Ms. Houston was there, and she restrained

10  the dog and brought him up to their minor son's bedroom.

11  Q.  How did the entry team locate Mr. Jones inside the

12  residence?

13  A.  So, after the dog was restrained, we made entry into the

14  main living room area -- or the entry team did.  And

15  Ms. Houston came outside.  She sat on the front steps.  And

16  Mr. Jones -- while we were making entry, making -- the entry

17  team, I could hear them personally making loud commands for

18  Mr. Jones to come out.  And, then, the police were there

19  making themselves known.  At that point, Mr. Jones came

20  walking down the stairs.

21  Q.  At what point did you -- sorry.

22       At what point did you first see Mr. Jones?

23  A.  When he came into -- down into the living room area.  And,

24  then, another -- one of the entry team members escorted him

25  outside, where I placed him into handcuffs.

1        Once I placed him into handcuffs, I walked him back

2   to the detectives -- the two Chicago police detectives -- and

3   he was placed in the back of their police car.

4   Q.  Now, after Mr. Jones is placed in that vehicle, did you

5   have a conversation with Ms. Houston?

6   A.  I did.

7   Q.  Where did that conversation take place?

8   A.  Right there in the front stoop of the residence.

9   Q.  Who else was present for that conversation besides you and

10  Ms. Houston?

11  A.  Task force Officer Patrick Fahey.  His last name is

12  spelled F-a-h-e-y.

13  Q.  Was Ms. Houston in custody during that conversation?

14  A.  No, she was not.

15  Q.  Specifically, was she in handcuffs?

16  A.  No, sir.

17  Q.  Did you identify yourself to Ms. Houston as a law

18  enforcement officer?

19  A.  Yeah.  I identified myself as a special agent with ATF,

20  and I advised her what was going on; that we had a federal

21  arrest warrant for Mr. Larry Jones, and that we were executing

22  that arrest warrant.

23  Q.  During that conversation, did you ask Ms. Houston any

24  questions about firearms?

25  A.  I did.  I asked if there was any firearms inside the

1    residence.

2    Q.   What did she say in response?

3    A.   She said she had three firearms upstairs in her room, and

4    that she was a concealed carry holder.

5    Q.   After she provided that information, did you ask her any

6    follow-up questions?

7    A.   Yeah.  I said if she could bring us to the firearms.  And

8    she said yes and walked us into the residence upstairs to the

9    third-floor master bedroom and directed us --

10   Q.   Now --

11   A.   -- to the firearms.

12   Q.   When you were still having the conversation with her

13   outside in front and you asked her to take you to the

14   firearms, how would you describe her demeanor during that

15   conversation?

16   A.   Extremely cooperative, friendly, understanding that we --

17   that law enforcement, had a job to do.  And she led us into

18   the residence and upstairs into the bedroom where she directed

19   us to -- specifically Task Force Officer Schoenecker -- to her

20   purse where one of the firearms was recovered, and to the

21   nightstand where eventually two firearms were recovered.

22   Q.   Okay.  I want to ask you a few background questions about

23   this bedroom.

24          Where was this bedroom located in the house?

25   A.   So, it's on the third floor.  It's almost like an attic

1  bedroom.  But it's been designed into a master suite with a

2  large walk-in closet toward the front of the house in the

3  bedroom and bed areas towards the back of the house.

4  Q.  Now, were you personally one of the law enforcement

5  officers who Ms. Houston directed up to this bedroom?

6  A.  Yes, I was.

7  Q.  How many other law enforcement officers were in the

8  bedroom at this point?

9  A.  Three.  Approximately three, including myself --

10  Q.  Could you observe --

11  A.  -- and two more.

12  Q.  Could you observe any clothing in plain view in that

13  third-floor bedroom?

14  A.  Yes.  There was male and female clothing in that

15  third-floor bedroom area.

16  Q.  Now, you mentioned a moment ago a firearm being located in

17  a purse?

18  A.  Yes.

19  Q.  How was it determined that there was a firearm in that

20  purse?

21  A.  She -- Ms. Houston directed us to that firearm.  She

22  pointed out her purse.  And I wasn't with her during that

23  exact moment, but what has been related to me is that she

24  directed Task Force Officer Schoenecker to her purse, where a

25  firearm was recovered.

1  Q.  Were additional firearms located in the bedroom besides

2  the one in the purse?

3  A.  Yes.  It is a nightstand directly next to the bed, and in

4  the top drawer of that nightstand there were two loaded

5  semiautomatic pistols in that -- in the top drawer.

6  Q.  Now, how was it determined that there were firearms in

7  that drawer of all locations in the bedroom where a firearm

8  could be stored?

9  A.  So, after the firearm was recovered the purse, Ms. Houston

10  walked over to me and said that there was one -- there was a

11  pistol in the top drawer of the nightstand.  She began to move

12  papers.  And I said, "Just don't grab it.  I don't want

13  anything to happen."  I was like, "Just direct me to it.

14  Don't touch it.  Just show me where it is."

15       She moved some papers and exposed a semiautomatic

16  pistol.  I then recovered that pistol, rendered it safe,

17  ejected a round from inside the chamber.  It had a magazine

18  with ammunition, and there was a round inside the chamber.

19  And I put that off to the side.

20       Then Ms. Houston said, oh, there's the other pistol

21  in the safe, which was directly next to the nightstand up

22  against the wall in a closet.  The closet doors were open.

23  They're mirrored -- tall mirrored glass sliding doors, and

24  they were slid together exposing the safe.

25       The safe door was open and unsecured.  It was wide

1    open.  And there was a pistol box inside there.  I reached

2    inside, grabbed the pistol box, opened up the pistol box and

3    it was empty.  I said, "There's no gun in here."  And she

4    thought for a second.  She goes, "Oh, it must be in the

5    drawer."

6            So, then I began to look inside the drawer and move

7    some more papers, and deeper in the drawer was another pistol,

8    which was also loaded with a round in the chamber and rounds

9    in the magazine.  I pulled that firearm, ejected the round

10   from the cham- -- removed the magazine, ejected the round from

11   the chamber, made it safe.  And we recovered those three

12   firearms.

13   Q.  Okay.

14          Now, with respect to that third firearm that was

15   recovered, just to be clear, where did Ms. Houston think that

16   firearm was?

17   A.  She thought it was in the safe.

18   Q.  And you searched that safe, correct?

19   A.  That's correct.

20   Q.  Did you find a firearm inside?

21   A.  No, I did not.

22   Q.  And you eventually recovered that third firearm from

23   deeper inside the nightstand drawer, correct?

24   A.  That's correct.

25   Q.  After you recovered that third firearm from deeper within

1    the drawer, what was Ms. Houston's reaction?

2    A.  She was like, "Oh, yeah, sometimes I keep it there or in

3    the safe."  She said it could be both places.

4    Q.  What else was inside that drawer besides the two loaded

5    firearms?

6    A.  There was normal, I mean, nightstand stuff.  Some mail

7    material in both the name of Ms. Houston and Mr. Larry Jones,

8    a pill bottle, some other personal papers.

9    Q.  The mail material that was in that drawer, did you say

10   there was mail addressed to both Mr. Jones and Ms. Houston

11   inside that drawer?

12   A.  Yes.  Yes, I believe so.  Yes.

13   Q.  Did you notice what address was listed for Mr. Jones and

14   Ms. Houston on that mail?

15   A.  I believe it's 625 Long Avenue.

16   Q.  And to be clear, at the time you observed that mail, you

17   were not inside a residence at 625 North Long Avenue in

18   Chicago, correct?

19   A.  No, sir.

20   Q.  You were actually in Broadview, Illinois; is that correct?

21   A.  Yes, sir.

22   Q.  I'm going to direct your attention to the photograph that

23   has been marked Government Exhibit Drawer 1 and Drawer 2.

24           Do you have those in front of you?

25   A.  I do.

1    Q.   What do those two photographs show?

2    A.   They show the open drawer with the mail inside the drawer.

3    Q.   Is this the nightstand drawer from which two firearms were

4    recovered?

5    A.   Yes.

6    Q.   Can you explain why the items that appear in these two

7    photographs are different?

8    A.   They were taken at different times after pulling some of

9    the paperwork out, exposing different letters, we'll say --

10   unopened letters -- addressed to Mr. Jones and Ms. Houston.

11   Q.   Among the items inside the drawer shown in these

12   photographs, were any items taken from locations outside the

13   drawer and placed inside the drawer for purposes of staging

14   these photos?

15   A.   Absolutely not.

16   Q.   Do these photos fairly and accurately depict that

17   nightstand drawer at two different points that you observed it

18   on June 25th, 2020?

19   A.   Yes.

20        MR. WALKER:   Judge, the government moves to admit

21   Government Exhibits Drawer 1 and Drawer 2 for purposes of

22   today's hearing.

23        THE COURT:   For that limited purpose, they're

24   admitted.

25      (Government Exhibits Drawer 1 and Drawer 2 received in

1  evidence.)

2  BY MR. WALKER:

3  Q.  Special Agent Sheehan, is there a gun visible in either

4  one of these photos?

5  A.  No, there's not.

6  Q.  Again, where were the two guns located in this drawer

7  relative to the other objects inside the drawer?

8  A.  They were underneath the paperwork in the drawer.

9  Q.  I want to direct your attention now to the photos that

10  have been marked Government Exhibit Mail 1 through Mail 5.

11  So, five photographs total.

12  A.  Yes.

13  Q.  Do you have those photos in front of you?

14  A.  I do.

15  Q.  What do these photographs show?

16  A.  They depict the letters that were found inside the drawer

17  addressed to Mr. Jones and Ms. Houston.

18  Q.  Do these photos fairly and accurately depict various

19  pieces of mail recovered from that drawer?

20  A.  They do.

21         MR. WALKER:  Your Honor, the government --

22  BY THE WITNESS:

23  A.  So, these --

24         MR. WALKER:  -- moves to admit these --

25  BY THE WITNESS:

1  A.  I just want to be clear.  They were never recovered.  They

2  were just photographed.

3         MR. WALKER:  I apologize.

4  BY MR. WALKER:

5  Q.  Do these photographs fairly and accurately depict pieces

6  of mail that were located, but not seized as evidence, from

7  that drawer?

8  A.  Yes, sir.

9         MR. WALKER:  Judge, the government moves to admit

10  Government Exhibit Mail 1 through Mail 5.

11         THE COURT:  For the limited purposes of this hearing,

12  those will be admitted.

13      (Government Exhibits Mail 1 through Mail 5 received in

14  evidence.)

15  BY MR. WALKER:

16  Q.  Agent, could you just state in summary what address is

17  listed for Larry Jones on the mail depicted in these five

18  photographs?

19  A.  625 North Long Avenue, Chicago, Illinois 60644.

20  Q.  Directing your attention to the photograph marked

21  Government Exhibit Safe, do you see that photo?

22  A.  I do, sir.

23  Q.  What does this photograph show?

24  A.  The open safe that was in the closet of that bedroom.

25  Q.  Does this photograph fairly and accurately depict the safe

1  that -- as law enforcement observed it on June 25th, 2020?

2  A.  Yes.  Yes, sir.  The door is open just like that.

3       MR. WALKER:  Your Honor, government moves to admit

4  Government Exhibit Safe.

5       THE COURT:  For the limited purposes of this hearing,

6  it's admitted.

7     (Government Exhibit Safe received in evidence.)

8  BY MR. WALKER:

9  Q.  Agent, I think you mentioned this a second ago.  Was the

10  door to that safe open or closed when you first observed it?

11  A.  It was open, sir.  We didn't have to open it.

12  Q.  And was there actually a gun inside that safe?

13  A.  No, sir, there was not.

14  Q.  But did Ms. Houston think there was a gun inside the safe?

15  A.  Yes, sir --

16       MR. TUNICK:  Objection.  We've gone over that twice

17  already.

18       THE COURT:  Overruled.

19       It's fine, Mr. Walker.  Be expeditious about things.

20  But it's fine.

21  BY MR. WALKER:

22  Q.  Agent, directing your attention to the photos marked

23  Pistol 1 and Pistol 2.

24  A.  Yes.

25  Q.  Do you see those photos?

1    A.   Yes, I do.

2    Q.   What's depicted in the exhibit marked Pistol 1?

3    A.   So, that is a photo of a gun box.  That's the gun box that

4    was the empty gun box that was inside the safe.  And those are

5    the two -- photographs of the two pistols, of the two

6    magazines and the two rounds that were in their respective

7    chambers.  I placed those guns on that gun box after I found

8    the empty gun box.

9    Q.   Where was the photograph marked Pistol 1 taken?

10   A.   It's like right outside the gun safe there on the floor.

11   Like on top of the clothing.  There was a whole bunch of the

12   clothing on the floor, and it was right outside the gun safe.

13   I was kneeling down at the time, so I just put the guns there

14   to keep track of them.

15   Q.   And what is depicted in Government Exhibit Pistol 2?

16   A.   That's an up-close photo of the pistol that was recovered

17   from Ms. Houston's purse, along with the magazine and the

18   round that was in the chamber.

19   Q.   Do these two photographs, Government Exhibits Pistol 1 and

20   Pistol 2, fairly and accurately depict the three firearms

21   recovered from the third-floor bedroom of the Jones-Houston

22   residence on June 25th?

23   A.   Yes, sir.

24             MR. WALKER:  Your Honor, the government moves to

25   admit Exhibits Pistol 1 and Pistol 2.

1          THE COURT:  For limited purposes of this hearing,

2     they will be admitted.

3          (Government Exhibits Pistol 1 and Pistol 2 received in

4     evidence.)

5     BY MR. WALKER:

6     Q.  Agent, did law enforcement take any photograph of these

7     three firearms as they were first observed in the bedroom but

8     before actually recovering them and rendering them safe?

9     A.  No, sir.  Ms. Houston was in the bedroom and was assisting

10    us.  So, just to make sure that we were safe and she was safe

11    and we were all safe, we just recovered them and made them

12    safe prior to photographing them.

13    Q.  After these three pistols were recovered but before

14    leaving the residence, did you have any additional

15    conversations with Ms. Houston about the firearms?

16    A.  Yeah.  I mean, we had other conversations about other

17    things, too, including her dog.  But we talked about that we

18    were going to take the firearms into our custody -- law

19    enforcement custody, ATF custody -- based on the nature of the

20    investigation.  And she was completely understanding.

21          And I explained to her that we were going to give her

22    a receipt for the firearms.  And we did provide her a ATF

23    property receipt.

24    Q.  Directing your attention to the exhibit that's marked

25    Property Receipt, do you have that in front of you?

1  A.   I do, sir.

2  Q.   What's depicted in this photograph?

3  A.   That's a photograph of the ATF receipt for property and

4  other items that was given to Ms. Houston by Special Agent

5  Johnson, who was on scene.  It lists out the three firearms

6  and their serial numbers.

7           MR. WALKER:  Your Honor, the government moves to

8  admit Exhibit Property Receipt for purposes of today's

9  hearing.

10          THE COURT:  For limited purposes of this hearing,

11  that's so admitted.

12      (Government Exhibit Property Receipt received in

13  evidence.)

14  BY MR. WALKER:

15  Q.   Agent, directing your attention to the bottom of this

16  form, do you see the line that says "Transferred By"?

17  A.   Yes.

18  Q.   And do you see a name written on that line?

19  A.   Yeah.  That's Shines- -- Shines- -- Shinesha Houston.  And

20  it's her signature, and she also wrote her name out.

21  Q.   Did you observe Ms. Houston sign this property receipt?

22  A.   I did.

23  Q.   Where did she sign it?

24  A.   She was back on the front porch area.

25  Q.   Directing your attention towards the top of this form, do

1  you see a reason for seizure stated on this form?

2  A.  Yes, I do.  It states, "Investigation."

3  Q.  Now, you mentioned that Ms. Houston during your initial

4  conversation with her said she had a concealed carry license;

5  is that correct?

6  A.  That's correct.

7  Q.  Now, if Ms. Houston had a concealed carry license, why

8  were these pistols seized for further investigation?

9  A.  In communication with other agents involved in this case,

10  there was shootings and other evidence that possibly could be

11  connected to these firearms.

12      Additionally, Mr. Jones, it was indicated to me that

13  he lived at that residence, and he is a felon and could

14  possibly also have had possession of these firearms based on

15  their storage locations inside that bedroom.

16  Q.  Is law enforcement currently investigating who else

17  besides Ms. Houston may have had possession of these three

18  firearms?

19  A.  Yes, sir.

20  Q.  Will that investigation include laboratory testing for DNA

21  and fingerprint evidence on the guns?

22  A.  Yes.  Yes, sir.

23  Q.  In the current environment we're in, approximately how

24  long does it take to get results on DNA and fingerprint

25  testing off of a firearm?

1    A.   Months.

2    Q.   During your conversations with Ms. Houston, did she ever

3    present you with a FOID card and a concealed carry license?

4    A.   Yes, she -- yes, sir.  She presented both those

5    identification cards, and a photograph was taken of those.

6    Q.   Directing your attention to Government Exhibit FOID and

7    CCL, is this the photograph that you took of the FOID card and

8    CCL that Shinesha Houston presented to you on June 25th?

9    A.   Yes.  I didn't take the photo, but this is a photograph on

10   that date; and it was taken by law enforcement personnel on

11   the scene.

12        MR. WALKER:  Your Honor, the government moves to

13   admit Government Exhibit FOID and CCL for purposes of today's

14   hearing.

15        THE COURT:  For that limited purpose, they're

16   admitted.

17       (Government Exhibit FOID and CCL received in evidence.)

18   BY MR. WALKER:

19   Q.   Agent, do you see the woman who is photographed on each of

20   these cards, the FOID card and the CCL?

21   A.   Yes, I do.

22   Q.   Based on a comparison between the woman depicted in those

23   photos and the woman you were speaking with on June 25th, did

24   you determine that Shinesha Houston was the individual that

25   you were speaking with outside the Broadview residence?

1    A.   Yes, sir.  It's the same individual.

2    Q.   Now, focusing on the FOID card, what's the date of

3    issuance on the FOID card?

4    A.   The date of issuance is 7-28-2017.

5    Q.   What's the expiration date listed on the FOID card?

6    A.   11-1-2019.

7    Q.   So, according to the face of the document, as of the date

8    that Ms. Houston presented this to you, was this FOID card

9    expired?

10   A.   Yes, sir.

11   Q.   What address is listed for Ms. Houston on the FOID card

12   and the concealed carry license?

13   A.   11 Oak Crest, Apartment 10, Carpentersville, Illinois

14   60110.

15   Q.   Directing your attention finally to the exhibits marked

16   Houston FOID and Houston CCL, do you have those two in front

17   of you?

18   A.   Yes, sir.

19   Q.   What are these two documents?

20   A.   These are law enforcement printouts from a law enforcement

21   database in Illinois.

22   Q.   And do these two reports generated from law enforcement

23   databases pertain to a particular individual?

24   A.   Yes.  They pertain to Ms. Houston regarding both her

25   concealed carry permit and her FOID card.

1    Q.  And can you tell the date on which these two reports were

2    generated?

3    A.  They were generated on 6-26-2020.

4         MR. WALKER:  Your Honor, the government moves to

5    admit Exhibits Houston FOID and Houston CCL for today's

6    hearing.

7         THE COURT:  For today's hearing, they're admitted.

8       (Government Exhibit Houston FOID and Houston CCL received

9    in evidence.)

10   BY MR. WALKER:

11   Q.  Agent, focusing first on Government Exhibit Houston FOID,

12   what address --

13        MR. TUNICK:  I don't have that document at all.  I

14   was never tendered that --

15        THE COURT REPORTER:  Please repeat, Mr. Tunick.  I

16   can't hear you.

17        MR. TUNICK:  I was never tendered that exhibit.  I

18   don't know where -- what document you're talking about.

19        THE COURT:  Mr. Tunick, it's in -- it's towards the

20   beginning of the exhibits pile that all of us received.  So,

21   the exhibits pile is 20 pages and the two that --

22        MR. TUNICK:  I didn't receive them like that, Judge.

23   I actually received a production through USAFX.  I didn't

24   receive them in exhibits.

25        THE COURT:  Okay.  That's fine.

1          They were also produced on Tuesday; is that correct,

2  Mr. Walker?

3          MR. WALKER:  That's correct, Judge.

4          I'm looking at the e-mail I sent to the Court

5  yesterday with the marked exhibits, and the two that I'm

6  referring to right now are Pages 7 and 8 out of the 20-page

7  pdf.

8          THE COURT:  And were those sent to Mr. Tunick or not

9  in an e-mail?

10          MR. WALKER:  They were.  Yes, Judge, I sent this to

11  your courtroom deputy and copied Mr. Tunick and my colleagues

12  on the case.

13          MR. TUNICK:  What was the time of that?

14          MR. WALKER:  It was an e-mail yesterday at 11:39 a.m.

15          MR. TUNICK:  I have --

16          MR. WALKER:  I just sent it to you again.

17          MR. TUNICK:  Okay.

18          And what exhibit are you referring to?  Oh, okay.

19  Government --

20          THE COURT:  Mr. Walker, if you could just --

21          MR. TUNICK:  I'm sorry.

22          THE COURT:  Government Exhibit Houston -- no, that's

23  okay.  Take a second.  Make sure you can find it.  It's

24  Government Exhibit Houston FOID --

25          MR. TUNICK:  Okay.  I got it up.

1    THE COURT:  -- and Government Exhibit Houston CCL.

2    MR. TUNICK:  I have it up.

3    THE COURT:  Okay.  Good.

4    Okay.  You can proceed, Mr. Walker.

5    MR. WALKER:  Thank you, Judge.

6  BY MR. WALKER:

7  Q.  Special Agent Sheehan, I was directing your attention to

8  the exhibit marked Houston FOID, the printout from law

9  enforcement databases.

10  A.  Yes.

11  Q.  What address for Shinesha Houston is reflected on this

12  FOID report?

13  A.  It's 625 North Long Avenue, Chicago Heights, in Cook

14  County, 60644.

15  Q.  And is the same address reflected for Ms. Houston on

16  Government Exhibit Houston CCL, as well?

17  A.  Yes.  625 North Long Avenue, correct.

18  Q.  Now, just to be clear, you did not interview Ms. Houston

19  at that address, correct?  You were in Broadview?

20  A.  That's correct, in Broadview.

21  Q.  And was the 625 North Long address, was that listed on the

22  physical FOID card and CCL that she presented to you on June

23  25th?

24  A.  No, sir.

25  Q.  So, based on your training, experience and knowledge of

1    this -- the law enforcement databases from which these reports

2    were generated, why is there an address for Shinesha Houston

3    at 625 North Long Avenue reflected on these reports?

4    A.   Because that's what she provided the State of Illinois as

5    her home address.

6    Q.   Special Agent Sheehan, are you familiar with the state

7    laws and regulations concerning FOID cards and concealed carry

8    licenses?

9         MR. TUNICK:  I'm going to object to the relevancy of

10   this, Judge.  This is not about Ms. Houston.  This is a

11   detention hearing for Larry Jones.

12        THE COURT:  Well, I guess it goes to whether or not

13   the defense is still proposing Ms. Houston as their first

14   preference for a third-party custodian or --

15        MR. TUNICK:  We're not, Judge.

16        THE COURT:  Okay.

17        MR. TUNICK:  We're not.

18        THE COURT:  Then, Mr. Walker, is there relevance to

19   this portion to the address discrepancies?

20        I draw no conclusions.  I'm just calling that as

21   shorthand.

22        Is there any relevance to the addresses other than

23   her appropriateness as a third-party custodian?

24        MR. WALKER:  There is not, Judge.  It was my

25   impression based on the cross-examination of Special Agent

1  Daou that the defense was still holding out hope for Ms.

2  Houston as a third-party custodian, but --

3          THE COURT:  That's okay.

4          MR. WALKER:  -- if they're no longer --

5          THE COURT:  They said they're not.  Yeah.

6          MR. WALKER:  So, other than that, yeah, there's -- I

7  can move on to my final questions for the agent.

8          THE COURT:  Okay.  Go ahead and do that.  Because it

9  sounds like the defense has said, we're going to propose his

10 grandmother instead.  So, we can move on.

11 BY MR. WALKER:

12 Q.  Okay, Special Agent, just to close up here, the 625 North

13 Long address that's reflected on the FOID and CCL reports for

14 Ms. Houston, did you see that address on any pieces of mail at

15 the Broadview residence?

16 A.  Yes.  The mail that was found inside the top drawer of the

17 nightstand where the --

18 Q.  And is that --

19 A.  -- two firearms were recovered.

20         THE COURT REPORTER:  I'm sorry, I didn't hear the

21 last part.  Please repeat.

22         THE WITNESS:  I'll just repeat the whole answer.

23 BY THE WITNESS:

24 A.  It was -- the same address, the 625 North Long Avenue, was

25 located on the mail found in the top drawer of the nightstand

1    where the firearms were recovered.

2    BY MR. WALKER:

3    Q.   To whom was that mail addressed?

4    A.   To both Mr. Larry Jones and Ms. Houston.

5              MR. WALKER:   Judge, I have no further questions for

6    the agent.

7              THE COURT:   Mr. Tunick?

8              MR. TUNICK:   Yes.   Thank you, Judge.

9                        CROSS-EXAMINATION

10   BY MR. TUNICK:

11   Q.   Let's start with this statement that you made about you

12   kept the firearms; that there's a possibility they might have

13   been involved in shootings and that was part of your

14   investigation.

15             My question is:   Is there a single bit of evidence of

16   any sort that these firearms were used in any shooting that

17   you're aware of?

18   A.   Not that I'm aware of right now, no.

19   Q.   And did any agent that -- as part of this investigation --

20   CPD, ATF, DEA -- ever indicate to you in any way that these

21   particular firearms, there's some evidence that they might

22   have been involved in a shooting?

23   A.   So, I'm not a case agent on this case.   I was with the --

24   assisting with the takedown.   And I know that based on the

25   investigation of the case that there was shootings related --

1  Q.  Okay.  I understand this is a long invest- --

2  A.  -- to the --

3  Q.  I'm talking about these firearms, these particular

4  firearms.  This is a long investigation.  There was -- it

5  spanned -- there was many defendants.  There's many wiretaps.

6  So, I want to focus in on these particular firearms.

7          Did anybody tell you from ATF, CPD or DEA that they

8  had some evidence or some knowledge or some indication from a

9  source that these firearms were used in a shooting?

10  A.  So, again, the nature of the investigation, like you said,

11  it was a wide-ranging investigation that was long-term, and

12  that there was shootings that were connected with this

13  investigation.  So --

14  Q.  I understand that, sir.  But I'm talking about that you

15  made -- this is a broad statement that you made that these

16  firearms -- was there anybody that gave you some evidence

17  that, hey, we have -- we got to check this firearm and compare

18  it with the shooting that occurred on a particular date, or we

19  have some evidence that these firearms were used in a

20  shooting?

21          Was there anybody that told that -- something like

22  that to you?

23  A.  That these --

24          MR. WALKER:  Judge, I'm going to --

25  BY MR. TUNICK:

1    Q.   -- firearms were --

2         MR. WALKER:  Judge, I'm going to object to this

3    question.  In support of its detention argument, the

4    government is not alleging that these three firearms were used

5    in any particular shooting.  I'll stipulate to that.

6         MR. TUNICK:  Okay.  Fine.

7         THE COURT:  Mr. Tunick, is that sufficient for you?

8         MR. TUNICK:  I think so.  I -- yes.

9         THE COURT:  Okay.  Carry on, then.

10   BY MR. TUNICK:

11   Q.   Now, with respect to the FOID report that was Houston

12   FOID, wouldn't that indicate that her FOID card is current --

13   that Ms. Houston's FOID card is current?  Wouldn't that

14   indicate that?

15   A.   Yeah.  I mean, it states active or new --

16   Q.   So --

17   A.   -- application submitted.

18   Q.   So --

19   A.   It states active.

20   Q.   So, the expiration date on the old card -- her FOID is

21   active; isn't that correct?

22   A.   Well, it states active, but it also states that it expires

23   on 11-1-2019.  So, with me --

24   Q.   Well, she --

25   A.   -- reading it --

1  Q.  I --

2  A.  -- it's my interpretation that she submitted a renewal

3  application and --

4  Q.  But you got this --

5  A.  -- it's still active.

6  Q.  You got this from the Illinois State Police, correct?

7  A.  Yes.  It was printed from their -- from the --

8  Q.  From Illinois State Police --

9  A.  -- an Illinois database.

10  Q.  -- database, and it says active, correct?

11  A.  Yes.  It states, "Active"; "Renewal Application

12  Submitted."

13  Q.  I can read.

14  A.  It's not --

15  Q.  The status says active.  Next to "Status," it says

16  "Active," true?

17          MR. WALKER:  Judge, I'm going to object to this.  If

18  Ms. Houston is not being proposed as a third-party custodian,

19  I don't see how this is relevant.

20          MR. TUNICK:  Judge --

21          THE COURT:  Mr. Tunick, can you explain?

22          MR. TUNICK:  They made it seem like this was some

23  nefarious type of storage; that her card -- they even pointed

24  to the fact that -- this is in rebuttal to their evidence that

25  showed her card was expired.  Why did they bring that out

1  then?  I just want to show that there's nothing nefarious

2  about this in any respect.

3  　　　　THE COURT:  Well, I think -- and I could be wrong

4  here, but I think the government was going down that line of

5  questioning when they thought that Ms. Houston was still being

6  proposed as a third-party custodian.  I think they were trying

7  to show that she wasn't up to date on her paperwork or what

8  have you.

9  　　　　I mean, now that they understood that you're

10  proposing Mr. Jones' grandmother as a third-party custodian, I

11  don't know that there's relevance here.  But I'm going to give

12  you leeway on this, and feel free to explore it as you need.

13  　　　　MR. TUNICK:  I will be brief.

14  　　　　THE COURT:  That's okay.

15  BY MR. TUNICK:

16  Q.  By the current status of her FOID response, it does show

17  her card to be active, true?

18  A.  Yes.  It says, "Status Active"; "Renewal Application

19  Submitted."

20  Q.  I understand what else it says.  It also says her name,

21  her city, her height and weight, but you don't make any

22  mention of that, do you?

23  A.  I mean, if you want me to reference that, yes, absolutely.

24  Q.  No --

25  A.  It says --

1  Q.  -- I don't.

2  A.  -- her name, Ms. Houston, Shinesha.  Her street address of

3  625 North Long Avenue, Chicago Heights -- city -- sorry, City

4  of Chicago Heights, Cook County.  The ZIP is 60644.  Her

5  height is 5'1.  Her weight is 151.

6  Q.  Okay.

7  A.  Her hair is brown.  She has brown eyes.

8  Q.  Okay.

9  A.  I can --

10  Q.  Good.

11        So, let's turn to -- I'm just going to be brief on

12  this Long address.

13        Now, do FOID cards under Illinois state law, are they

14  allowed to be issued to an address that's not on your Illinois

15  license?

16  A.  I don't know.  I don't --

17        MR. WALKER:  Judge, same objection.  I did not

18  explore the contours of state law.  I specifically moved past

19  those questions.  I don't think Mr. Tunick should get to

20  explore in that area if I didn't.

21        THE COURT:  Well, I mean, Mr. Tunick, is there

22  relevance here?  Is this --

23        MR. TUNICK:  I'm just trying to clarify some of these

24  issues the government brought up.  And I'll move on.  I'll

25  move on to what I think is -- that's fine.

1          THE COURT:  Mr. Tunick, go ahead and explore.

2    Because I think there is some talk about different addresses.

3    Make your record on that.  That's fine.

4          MR. TUNICK:  Okay.

5    BY MR. TUNICK:

6    Q.  That the Long address -- were you able to find out who

7    lived at the Long address in Chicago Heights?

8    A.  So, it's my understanding that there's not even a Long

9    address in Chicago Heights.  That's actually located in

10   Chicago, city proper.  So -- and -- but I haven't been to that

11   address ever.

12   Q.  Okay.

13         Were you able to find out that that was previously

14   what was listed on Ms. Houston's Illinois license?

15   A.  I don't have Ms. Houston's license.  So, no, I don't -- I

16   wasn't able to do that.

17   Q.  Well, let's get back to the search.

18         So, did you obtain consent to search the house?

19   A.  For the limited purposes of the firearms, for her to

20   direct us to the firearms.  But we did not search the entire

21   house.  No, sir.

22   Q.  Okay.

23         So, did you -- you had consent to obtain the

24   firearms; is that what you're saying?

25   A.  Yes.  Ms. Houston walked us up the stairs into the bedroom

1    and directed --

2    Q.  Why don't you just --

3    A.  -- us to the firearms.

4    Q.  -- answer my question without -- can you just answer my

5    question?

6          You had consent to search with respect to the

7    firearms -- to obtain the firearms; "Yes" or "No"?

8    A.  Ms. Houston directed us up to the firearms.  We rendered

9    them safe.  And, then, we determined that we -- based on the

10   investigation, that we were going to take those into our

11   custody, yes.

12   Q.  Okay.

13         Now, you said she was very cooperative, correct?

14   A.  Absolutely.  Yes, sir.

15   Q.  And you said, in fact, she allowed you to search a

16   vehicle, correct?

17   A.  That's correct, yes, sir.

18   Q.  And there was nothing discovered in that vehicle, correct?

19   A.  That's correct.

20   Q.  And the guns themselves -- there was a lot of agents in

21   the house, correct?

22   A.  I wouldn't say a lot, but there were a handful, yes.

23   Q.  Okay.  There was ATF agents, correct?

24   A.  Yes.  There was three ATF agents total, including myself.

25   Q.  CPD?

1    A.   No.  I don't believe any CPD personnel came into the

2    house, no, sir.

3    Q.   DEA?

4    A.   No, sir.

5    Q.   So, are you saying there's only three law enforcement

6    officers in the house?

7    A.   No.  There was task force officers with ATF.  They were

8    also there.

9    Q.   Okay.

10        So, it's fair to say that -- and it was early -- was

11   it early in the morning?

12   A.   Yes, sir.  It was 6:00 a.m.

13   Q.   Okay.

14        And, of course, you guys entered with some force,

15   correct?

16   A.   Yes.  We had to force the front door.  That's correct.

17   Q.   And, so, it would be fair to say that it was kind of a

18   hectic or emotional scene for Ms. Houston, correct?

19   A.   Her demeanor was --

20        MR. WALKER:  Object to foun- -- object to foundation.

21        THE COURT:  I'll sustain it.

22        MR. TUNICK:  I'll strike that.  I'll strike that.

23        THE COURT:  That's fine.

24   BY MR. TUNICK:

25   Q.   So -- well, she did her very best to help you get the guns

1  that were in her name, correct?

2  A.  Yes.  She was very cooperative bringing us to the

3  firearms.  Yes, sir.

4  Q.  And she thought the gun was in the safe, correct?

5  A.  Yes.  She still thought one gun was in the safe, yes, sir.

6  Q.  And there was a gun.  There was also a carrying case for

7  the weapon, correct?

8  A.  Carrying case?  I don't understand.

9  Q.  A gun case.  A gun case.  The picture you took, Government

10 Exhibit Pistol 1, shows a gun case, correct?

11 A.  Oh, a pistol box, yes, sir.  Sorry.  I guess I -- I

12 apologize.  I didn't mean to --

13 Q.  And who --

14 A.  -- frustrate you.

15 Q.  Did you put those two guns in the gun case to take the

16 picture?

17 A.  So, when I rendered the two firearms safe, I just placed

18 them on top of the gun box, yes, sir.

19 Q.  Okay.

20        Now, in the drawer -- the nightstand drawer -- there

21 was -- the guns were not visible, correct?

22 A.  That's correct.

23 Q.  And there was a Bible in there, correct?

24        MR. WALKER:  Objection.  Relevance.

25        THE COURT:  What's the relevance of that, Mr. Tunick?

1          MR. TUNICK:  Judge, they're showing that there was --

2    indicating mail that was in Mr. Jones' name.  I want to point

3    out that there was substantial other items in there.  That's

4    all.  Doesn't show that it was Mr. Jones' drawer.

5          THE COURT:  Yeah, go ahead.  Overruled.

6    BY MR. TUNICK:

7    Q.  There was a Bible in there, correct?

8    A.  I think so.  I think that's what the photo is.  I

9    didn't -- sir, I didn't dig around in that drawer.  Like I

10   said, we didn't search the house --

11   Q.  You can -- you can answer -- you can answer "I don't

12   know."  That's a perfectly --

13   A.  I -- I don't --

14   Q.  -- fine answer.

15   A.  I don't know.  I mean --

16   Q.  Okay.

17   A.  -- it appears that -- in the corner there is a Bible.  It

18   appears like a Bible, but I didn't touch it.

19   Q.  Okay.

20          You don't have to know everything.  You don't know

21   the answer, just say you don't know, all right?  I mean, I'm

22   not trying to put you in a box.  I'm just trying to get

23   evidence.

24          So, there was also mail addressed to Ms. Houston,

25   correct?

1    A.  Yes.  I believe there's letters that were addressed to

2    both Mr. Jones and Ms. Houston.  They were like the same -- on

3    the same letter.  It was like they were -- owned the account

4    or something like that.

5    Q.  Well, did you go through every piece of mail in that

6    drawer?

7    A.  No, I did not, sir.

8    Q.  So, did you see any letters not just addressed to both of

9    them, just addressed to Ms. Houston in that drawer?

10   A.  I don't recall.

11   Q.  And, then, there's Government Exhibit Drawer 1 shows

12   pictures of Mr. Anthony's Cleaners.  Was that for woman's

13   clothes or men's clothes, or do you not know?

14   A.  I don't know.  I didn't inspect that.

15   Q.  Okay.

16         The pill container.  Was the prescription made out to

17   Mr. Jones or Ms. Houston?

18   A.  I don't know that.

19   Q.  So, the only documents that were pulled were any document

20   that had Mr. Jones' name, correct?

21   A.  No, that's not correct.  It was the top letters that were

22   on top of the drawer.  We didn't just specifically look for

23   Mr. Jones' name.  It was just the top mail, we pulled that

24   mail.  That was it.

25         Again, we didn't dig around or make -- try to make a

1   mess.  This wasn't a search warrant.  We tried to be as gentle

2   as possible because Ms. Houston was cooperating, and we didn't

3   want to disrupt her life that much.

4   Q.  Regardless, there was insurance information sent to both

5   Mr. Houston and Ms. Jones, correct?

6   A.  That's correct.

7   Q.  And, so, you didn't actually take the contents of the

8   drawer out; is that correct?

9   A.  No, we didn't go through every item inside that drawer.

10  No, sir.

11  Q.  Okay.

12       Now I want to refer you to Government Exhibit Pistol

13  2.  Do you see that?

14  A.  Hang on one second.  Let me get to it.

15    (Brief pause.)

16  BY THE WITNESS:

17  A.  Yes.  Pistol 2.  Yes, sir.

18  BY MR. TUNICK:

19  Q.  Okay.

20       And that pistol is placed on a piece of paper that

21  says underneath it "Larry Jones."  Do you know who placed that

22  pistol on a piece of paper that said "Larry Jones"?

23  A.  The special agent who took the photo.

24  Q.  Who would that be?

25  A.  Special Agent Daniel Johnson.

1    Q.   Okay.

2         But when you found that pistol, it wasn't on that

3    particular piece of paper, was it?

4    A.   No, sir.  It was in her purse, sir.

5    Q.   Okay.

6         MR. TUNICK:  Judge, may I have just a moment to get

7    my papers together?  It will be very brief.

8         THE COURT:  That's fine.

9         MR. TUNICK:  Thank you.

10   (Brief pause.)

11   BY MR. TUNICK:

12   Q.   It would be fair to say that Mr. Jones was cooperative,

13   too, correct?

14   A.   Yes, sir.  I had very limited interaction with him, but

15   during my time and from everything I've been told, that, yes,

16   he was cooperative.

17   Q.   He didn't resist arrest in any way, correct?

18   A.   No, sir, absolutely not.

19   Q.   He came down when he was -- you know, when officers

20   identified themselves, correct?

21   A.   Yes, sir.

22   Q.   He didn't threaten any officer in any way, correct?

23   A.   No, sir.

24   (Brief pause.)

25        MR. TUNICK:  Judge, I don't have any other questions

1  at this time.

2        THE COURT:  Okay.

3        Mr. Walker, any redirect?

4        MR. WALKER:  No, Judge.  Thank you.

5        THE COURT:  Okay.

6        MR. MITCHELL:  Your Honor, this is John Mitchell.  I

7  actually just wanted to clarify one thing, if I could.  I know

8  it's a little bit -- it's hard to do over the phone.  But I

9  think there might have been a miscommunication during the

10 cross-examination of Special Agent Daou, specifically with

11 respect to the charges that the confidential informant has

12 pending against him right now.

13        So, I'm not sure the best way to do this, but

14 basically, I might be -- I might have misunderstood, but I

15 think the question from Mr. Tunick was the confidential

16 informant is, in fact, facing -- has pending firearms charges.

17        And I think, if I understood correctly, Special Agent

18 Daou might have agreed with that.  I think that was a

19 miscommunication.  And if I could possibly clarify that there

20 are no pending firearms charges against the confidential

21 informant.  In fact, the charges are -- relate to narcotics

22 and money laundering.  I don't --

23        THE COURT:  Okay.  I --

24        MR. MITCHELL:  -- know what the best way -- I don't

25 know the best --

1          THE COURT:  I would accept that by proffer.

2          But, Mr. Tunick, is that okay to have that correction

3   by proffer?

4          MR. TUNICK:  If I could just have one second, Judge.

5       (Brief pause.)

6          MR. TUNICK:  Judge, I'm just looking at a footnote

7   and it says he hopes it would carry a reduced sentence for

8   likely charges due to the source's -- oh, prior arrest for

9   firearms offense.  Okay.  Never mind.

10          That's fine.

11          THE COURT:  Okay.  Yeah, I think that's fine.

12   Obviously, if we had jurors here, we'd handle it differently.

13   But I get the point for the purposes of this hearing.

14          Government, any other witnesses at this point?

15          MR. WALKER:  No, Judge.

16          Can Special Agent Sheehan be excused and leave the

17   call now?

18          THE COURT:  Give me one second because I have --

19          MR. WALKER:  Sure.

20          THE COURT:  -- at least one question and to the

21   extent you need the agents to answer this.

22          So, with folks with closer eyes than myself, if we

23   compare the three guns that were seized from the home that

24   Agent Sheehan just talked about, if we compare that with the

25   guns in the text photo, do any of those guns appear to be the

1  same?

2       I certainly understand you have to look at serial

3  numbers and things like that, but just in terms of their

4  physical appearance -- make, caliber, what have you -- do any

5  of those guns in the text photo match up with what was seized

6  from the home?

7       MR. MITCHELL:  Your Honor, Special Agent Paul Daou is

8  just looking at the photos right now.  If you could just give

9  us one moment?

10       THE COURT:  That's fine.  And I will take the

11  defense's perspective on this, as well, to the extent you feel

12  capable of doing it.

13       (Brief pause.)

14       SPECIAL AGENT DAOU:  Your Honor, this is Special

15  Agent Paul Daou.

16       THE COURT:  Go ahead.

17       SPECIAL AGENT DAOU:  After comparing the two

18  photographs, I can't say for certain that either of those guns

19  are the ones depicted in that photograph.  It's hard to tell.

20  The two-toned one that was recovered, I don't know if that was

21  a Taurus semiautomatic pistol or not.  And there is a gun

22  similar to that in the picture, which is a Taurus; but I can't

23  tell from the photo from the one that was recovered.  So, I

24  can't say definitively that it could be.

25       THE COURT:  Okay.

1    Mr. Tunick, would you want to inquire further on

2 that?

3    MR. TUNICK:  I don't think so, Judge.  I don't think

4 I can add anything to it, actually, at this point.

5    THE COURT:  Yeah, that's fine.  I agree.  And I

6 appreciate the agent looking at that.  Thank you for that.

7 And I just want to give everyone a chance and perhaps ask

8 questions that I hadn't thought of.

9    Okay.  I think we're done with the two agents, then.

10 They're certainly welcome, of course, to stay on the line if

11 they would like.  But I don't think we need any further

12 testimony from them, as long as both parties agree with that.

13    MR. TUNICK:  Yes, I agree.

14    MR. WALKER:  I agree, too, Judge.  Thank you.

15    THE COURT:  Great.  So, both agents, you're certainly

16 excused if you like; but, as I said, as is the public, you're

17 welcome to stay on the line.

18    So, I want to talk a little bit -- I would like

19 fulsome presentations from each side as we would do in any

20 detention hearing, as well as -- and as part of that, I would

21 like to hear from both sides what they took away from this

22 testimony, what they think it means for purposes of detention

23 and release.

24    But before we get there, I want to ask about the

25 proposed third-party custodian because I understand it is

1   Mr. Jones' grandmother.

2          So, understandably, unless I'm wrong, Pretrial has

3   not yet had an opportunity to do the background work they

4   would normally do on her.  Is that right?

5          MR. TUNICK:  Actually, Judge, I reached out to

6   Pretrial early yesterday.  They did interview her.  They --

7   gave her date of birth.  I think they should have a full scope

8   of Ms. Moore.

9          MR. WIERSEMA:  Yes, Judge --

10          THE COURT:  Okay.

11          MS. WIERSEMA:  This is Justin with Pretrial Services.

12          We did speak with Ms. Moore.  And just briefly in

13   summary, she's willing to act as a third-party custodian.  As

14   we stated, she's his grandmother and she resides at an address

15   on South Springfield.  She usually lives alone; but at this

16   time, due to her age, she has a son that's staying with her to

17   kind of help her out and provide her care so she doesn't have

18   to go out very much.

19          She's retired, receives about $2,000 a month from her

20   retirement pension.  She's willing to financially support the

21   defendant best she can.  She also pays for her own food and

22   her own rent.  She agrees to have him there under location

23   monitoring.  There are no weapons or dangerous animals in the

24   residence.  And she does not have any criminal history.  She's

25   reported not having any money or property that she'd be able

1    to post for bond.

2            THE COURT:  Okay.

3            MR. WIERSEMA:  So, we did, yes, have a chance to

4    speak with her.  Geraldine Moore is her name.

5            THE COURT:  Okay.  Thank you, Officer, for doing that

6    ahead of time.  That helps tremendously.

7            So, at this point, let me just kind of go through our

8    usual progression here, then.  So, we've heard testimony from

9    two agents.  I think at this point let's talk about

10   presumption.

11           Government, I presume that you suggest this is a

12   presumption case, correct?

13           MR. WALKER:  Yes, Judge, under 3142(e)(3)(A).

14           THE COURT:  Okay.

15           And, Mr. Tunick, I presume you don't dispute that.

16   And, obviously, it's a rebuttable presumption, but no dispute

17   that this falls under the category of presumption cases,

18   correct?

19           MR. TUNICK:  Yes, Judge.  I think it's -- now it's

20   like 80 -- 90 percent of federal drug cases trigger the

21   presumption.  So, yes, I understand there's a rebuttable

22   presumption.

23           And I don't even call it presumption.  I think it

24   just calls us to produce evidence really in the case -- for

25   the defense to produce evidence.

1     But, yes, that is correct.

2     THE COURT:  Okay.

3     So, in light of that, I usually allow in presumption

4   cases -- and as it's pointed out, it is rebuttable.  The

5   hurdle is not a high one, but the defense has to come forward

6   with some evidence to rebut that.

7     So, I'll allow the defense to go first in terms of

8   your presentation.  Why don't you start, Mr. Tunick, and then

9   we'll go back and forth between you and the government.

10     MR. TUNICK:  Yes, Judge.  I'm going to just close my

11   door for one second so there's no other noise.

12     THE COURT:  That's okay.  That's okay.

13     (Brief pause.)

14     MR. TUNICK:  Thank you.

15     THE COURT:  That's fine.

16     MR. TUNICK:  Again, James Tunick on behalf of Larry

17   Jones.

18     Judge, this case -- Mr. Jones, his last conviction

19   was for -- was 18 years ago, and it was for possession of

20   cocaine.  He hasn't been arrested for 13 years and those -- in

21   that -- between the time he was convicted of the cocaine

22   offense, those are all minor traffic offenses, cases that were

23   dismissed.  He answered all the charges on all those cases,

24   showed respect for the court.

25     He even showed respect for law enforcement, according

1   to the testimony, when they entered the residence.  He

2   absolutely, according to the agent, was cooperative and, you

3   know, assist in any way; didn't do anything to threaten or

4   alarm the officers.

5           And that kind of shows how he acted toward his cases.

6   He's complied.  He's appeared.  He shows a steady history of

7   employment.  He's been working at One City United for two

8   years.

9           This is really just a -- not a large-quantity drug

10  case.  There is no weapons charges despite all this talk about

11  weapons.  There's no 922(g)'s.  There's no 924(c)'s.  There's

12  no gun charges here, despite the CS basically trying to buy a

13  gun off him for six months.

14          I mean -- and no matter what he might have said,

15  there was never a sale.  There wasn't even a negotiation.

16  There wasn't even a price.  There wasn't anything to indicate

17  that it was -- it actually rose to the level of an attempt.

18  It was simply discussions, and it was prodded by the ATF

19  agents.  They specifically even -- they used the word

20  "directed."  It wasn't even my word.  It was -- the questions

21  from the government:  You directed the confidential source to

22  try and buy a gun off Mr. Jones.

23          And each time it was the same thing.  He said, yeah,

24  yeah, I'll get you the next one.  Or, you know, I know you

25  want a good one.  I mean, and that -- that doesn't show that

1  he had a gun.  That shows that he was just trying to, you

2  know, brush -- basically get out of the situation.  And he

3  even said he didn't have a gun.  You know, "I'll get you the

4  next one.  I don't have one."  And, then, he said the same

5  thing again in November.

6          So, despite all this stuff and talk about guns,

7  there's no charge of guns.  And even the evidence that was

8  elicited doesn't even rise to a level that would indicate that

9  he even ever possessed a gun.  They never even elicited

10 testimony that the CS even ever saw him with a gun.  They

11 didn't even say that.

12         I mean, so it's really, to me, you know, a little bit

13 overblown, these discussions.  And I think that that is an

14 important fact because I know the government is going to argue

15 that he is a danger to the community because of these

16 conversations and these guns.

17         And the picture itself, God, I can't imagine anything

18 left in a picture that was sent to a confidential source than

19 this particular picture as far as negotiating a gun sale.  He

20 didn't say, hey, I have these guns for you.  He didn't say

21 how -- that, I can sell these for a price.  He didn't say

22 anything.  He sent a picture, according to the government's

23 evidence, you know, that -- without anything, without any

24 further -- I'm sure there was evidence, some sort of follow-up

25 by the source once he showed the ATF.  I'm not privy to those

1  particular, you know, discussions at this point. But if there
2  was anything elicited after that, I'm sure we would have heard
3  it.

4        And all it was was a picture that we don't know who
5  took it -- supposedly we know when -- and where it was even
6  taken. I don't even know -- so, there's a lot of talk about
7  guns. Obviously, in an attempt to try and say that he is --
8  Mr. Jones is a danger to community. But I don't see there's
9  much strength to that argument or much weight to that evidence
10  at all.

11        In essence, it is a smaller-ish drug case at this
12  particular point in time. And it's an indictment. It's not
13  even a criminal complaint. So, these go all the way back to
14  2018 to 2019. And if he was such a danger to the community or
15  -- if he was, I suspect they would have charged him but --
16  back then.

17        So, he's charged by way of indictment. And it's
18  really -- it's not even charged as a statutory minimum case.
19  It's -- because they don't even charge it as at least a
20  hundred grams. They don't charge any of the counts. I
21  understand that he has that, you know, conviction when he was
22  16 years old. I don't know the facts of what transpired back
23  then. But he clearly -- I think it's fair to say he's not the
24  same person. He hasn't been arrested in 13 years. He doesn't
25  show a conviction for 18 years.

1          Let me just --

2       (Brief pause.)

3          MR. TUNICK:  I don't see any real reason to argue

4    risk of flight.  His whole -- you know, he lives with his

5    girlfriend and -- he was living with his girlfriend and his

6    son.  I understand if we -- we have this third-party

7    custodian.  And this was an effort to really simplify this; to

8    -- not to complicate it in any way; to allow him to go and

9    live with his grandmother and her son, who actually is a youth

10   pastor.  I think it's a great -- would be a very secure place

11   for him.

12          I don't see any issue about risk of flight.  He's

13   never left the United States.  He has deep ties in the Chicago

14   community.  Mother, father, brother, sisters, all reside in

15   Chicago, who he has close contact with.  Obviously, very, you

16   know, close to Ms. Houston and his child.  He's appeared at

17   every court date for the last 17 -- those minor tickets for

18   the last 17 years.  I don't see any real evidence that he's a

19   risk of flight.

20          So, then it really just comes down to whether the

21   government has shown that by clear and convincing -- or shown

22   that he is -- there's no set or combination of conditions that

23   can reasonably assure the safety of the community.  I submit

24   to you, Judge, if he was put on EM and living with his

25   grandmother and just allowed to go to work, there are

conditions -- and the statute favors release -- that can

surely reasonably assure the safety of the community in this

case.

There was -- again, there was no drugs found at the

residence.  There was no drugs in the car.  There was car

stops.  There was nothing found at that time.  There was

clearly -- given all the facts in this case, I think we're

proposing a very reasonable bond that would reasonably assure

the safety of the community in this case.

And with that I would rest, your Honor.

THE COURT:  One question before -- I'll obviously

give the government an opportunity to respond.

Mr. Tunick, I believe you -- what did you say his

grandma had done for work before she retired?

MR. TUNICK:  Actually, I'm not sure.

Ms. Moore, can you chime in on that, please?

Ms. Moore?

MS. MOORE:  Yes, sir.  I worked with Catholic

Charities 16 years before I retired.  And before then, I

worked at a printing company.

THE COURT:  Thank you, ma'am.

The officer mentioned you have your son living with

you.  What does your son do in terms of your care, if

anything?

MS. MOORE:  Well, he helps take --

1          THE COURT:  Or do you care for him?

2      (Laughter.)

3          MS. MOORE:  Well, we care for each other.  I do the

4    cooking and cleaning around the house, but he goes to the

5    store for me.  He takes me where I need to go, which they

6    don't like for me to leave the house at this particular time.

7          MR. TUNICK:  Because of COVID.

8          MS. MOORE:  Yes.  But it's a little hard to be in

9    that house all day every day.

10          So -- but he takes -- he shops.  Anything I need

11    doing, he does it.  If he can keep me in the house, that's

12    what he tries to do.  But I try real hard to get out sometime.

13    So --

14          MR. TUNICK:  Is he employed?

15          MS. MOORE:  Oh, yes, sir, he's employed at this time.

16          MR. TUNICK:  And --

17          MS. MOORE:  He works at Benedictine in Wheaton,

18    Illinois.  He works at the school there.  He's been a youth

19    pastor and he's worked with FCA.  We both have attended -- I

20    still attend Lawndale Community Church, and I've worked for

21    the clinic there in Lawndale, Marquette Christian Health

22    Center.  That's where I spent maybe the last 40-something

23    years.  We came here in '74, and I've been in that

24    neighborhood ever since.

25          THE COURT:  Okay.  Thank you for that, ma'am.  I

1    appreciate that.

2         A question for the government just before you start

3    your presentation:  Is it the government's position there is

4    no mandatory minimum in this case for --

5         MR. WALKER:  Judge -- no, our position is that

6    there's a ten-year mandatory minimum.

7         THE COURT:  For Count 1, that is?

8         MR. WALKER:  It's Count 1.  The 851 allegations are

9    repeated in Counts 8 and 9, but that just changes the

10   statutory maximum on those.  It doesn't impose a minimum.

11        THE COURT:  Okay.

12        Mr. Tunick, any response to that?

13        MR. TUNICK:  Judge, I don't really think that's a

14   proper 851 notice by putting a prior conviction in the

15   indictment.  The conviction was 18 years ago.  It has to be

16   for a serious drug felony.  My reading of the pretrial report

17   was for possession.  So, just because the government alleges

18   it in the indictment doesn't make it true that it increases

19   the mandatory minimum.  I --

20        THE COURT:  Well, it could apply to the 851 issue --

21   and I understand that everyone would have to look very closely

22   to see whether Mr. Jones is 851 eligible or not.  But with

23   respect to at least Count 1 that I'm looking at, any dispute

24   that that carries at least the mandatory minimum in Count 1?

25        MR. TUNICK:  I do dispute it, Judge.  I don't think

the 18-year-old controlled substance offense qualifies as a
serious drug felony based on the recent laws that have been
passed under the First Step Act.  It has to be -- and, then,
the other conviction was he was 16 years old as a juvenile.
You know, I would probably contest both of them.  I've got to
tell you that I would.  And I don't agree -- you know, I agree
when the government's position is clearly legally correct.
I'm not certain it is on this point.  I just -- I'm not --

THE COURT:  Okay.

MR. TUNICK:  I can't agree with that.

THE COURT:  Mr. Walker, any response?  And I'm going
to give you a fulsome presentation, but just any response on
that point?

MR. WALKER:  Yeah.  So, Paragraph 2 of Count 1, the
conspiracy count, explicitly alleges that Jones' offense
involved 100 grams or more of heroin.  So, this is at least a
five-year mandatory minimum case based on that quantity
allegation.

As to the 851 enhancement issue, there is no prior
drug offense being relied upon for an 851 enhancement; it is
only Mr. Jones' prior conviction for attempted murder.  And
it's the government's position that that conviction qualifies
as a serious violent felony as that term was defined in the
First Step Act.

THE COURT:  Okay.

1          And according to the Pretrial Services report, that

2   the -- the attempted murder charge, the conduct was in 1997,

3   when he was 16, correct?

4          MR. WALKER:  That is what the Pretrial Services

5   report says.  And I understand there might be motion practice

6   down the road about whether that's a valid 851 predicate.

7          THE COURT:  Right.

8          MR. WALKER:  But I don't --

9          THE COURT:  I understand.

10         MR. WALKER:  -- think that will be resolved today.

11         THE COURT:  Sure.  No, I get that.  I get that.  But

12  I was just pointing out there's -- seeing there's no dispute

13  from the government that that date is correct, that he was 16

14  at the time of that conduct.

15         MR. WALKER:  That's correct.  There's no dispute

16  about that.

17         THE COURT:  Okay.

18         And, Mr. Tunick, based on the allegation of a hundred

19  grams or more in Paragraph 2 of the first count, any dispute

20  that that would carry mandatory minimum if he were convicted

21  of that?

22         MR. TUNICK:  That would be a five-year mandatory

23  minimum, assuming everything -- you know, there are obviously

24  ways around that, but --

25         THE COURT:  Sure.

1       MR. TUNICK:  -- yes, that would -- I actually

2    missed -- usually it's listed in the charging part of the --

3    so, yes.  The hundred grams would trigger a five-year

4    mandatory minimum.  Obviously, the Court is aware there is

5    some exceptions.

6       THE COURT:  Yes, of course.  Yeah.  And I similarly

7    kind of looked at that first paragraph and had to -- that's

8    fine.  I just wanted the record to be clear that we're all on

9    the same page with that.  And there will be litigation with

10   respect to the 851 if it gets that far.

11      Okay, government, if you want to make your

12   presentation.

13      MR. WALKER:  Thank you, Judge.

14      I'm going to start by just talking about the nature

15   of these charged offenses.  I would disagree with Mr. Tunick's

16   characterization of the charges here.  These are serious drug

17   charges.  A grand jury found probable cause to believe that

18   Mr. Jones was part of a conspiracy to distribute heroin for

19   over one year, and that that conspiracy involved at least two

20   other named people, Marsha Fountain and Jamar Spencer.

21      Mr. Jones is alleged to be personally responsible for

22   100 grams of heroin distributed during that time period.  And

23   the grand jury also found probable cause to believe that he

24   was -- had a conviction for a serious violent felony,

25   attempted murder, at the time he was selling heroin.

1        The seven distribution counts in this indictment are

2   also serious.  Not because they allege mandatory minimum

3   quantities, but they show that the charged conduct in this

4   case was not a one-time mistake, a one-time drug deal.

5   Instead, the grand jury found probable cause to believe that

6   Jones sold heroin seven separate times over a 13-month period.

7   So, he was selling heroin as a regular and recurring activity,

8   not something that was isolated and sporadic.

9        As to the weight of the evidence, I know this factor

10  is less important than the others; so I'm only going to touch

11  on it briefly.  There are two main sources of evidence in this

12  case:  Intercepted calls that were obtained pursuant to a

13  court order between May of 2019 and July of 2019, during which

14  Mr. Jones discussed drug trafficking with his two named

15  co-conspirators and others; and, as we heard partially in

16  Special Agent Daou's testimony today, the distribution counts

17  are based on controlled buys by a confidential source who was

18  wearing an audio and video recording device during each of

19  those deals.

20       So, this is a case where Mr. Jones is going to be up

21  against his own image and his own words captured on audio and

22  video recordings.  And it's the government's position that

23  those recordings make clear that he was knowingly selling

24  heroin.

25       As to his history and characteristics, his criminal

1  history is serious.  He has an attempted first degree murder

2  conviction.  And I acknowledge that the arrest occurred when

3  he was 16 years old.  And it's very understandable that many

4  juvenile offenses are disregarded or assigned little weight

5  when we're doing the 3142 analysis.  But I would submit that

6  murder is different and should be --

7          THE COURT:  Attempted murder, right?  I just want to

8  be --

9          MR. WALKER:  I'm sorry.

10          THE COURT:  -- it was an attempt murder.

11          MR. WALKER:  I'm sorry.  Attempted murder.

12          -- is different, especially when the task at hand is

13  assessing whether releasing Mr. Jones would pose danger to the

14  community.

15          Now, in addition to that attempted murder conviction,

16  he has bond forfeitures in a misdemeanor gambling case and a

17  drug case, and he ultimately was convicted in the drug case.

18          So, his criminal history contains a conviction for a

19  violent felony, a drug crime and two bond forfeitures.  And

20  all of those factors about his background strengthen the

21  statutory presumption here that he should not be released.

22          The next issue I want to talk about is the issue of

23  firearms, which came up in the testimony of both agents today.

24  So, your Honor, you heard testimony that Mr. Jones was willing

25  to sell not just heroin but also a firearm to the confidential

source. And Jones even went so far as to text a photograph of
firearms to the confidential source. I agree with Mr. Tunick
that Jones is not currently charged with a firearms offense.
But this evidence in which Jones indicates his willingness to
sell a firearm on top of the heroin that he was already
selling to the CS is evidence that the Court can and should
consider; that Jones, according to his own words, both had
access to firearms and was willing to sell them.

The circumstances of his arrest and consent search of
the residence are also relevant to the 3142 analysis here. At
the time of his arrest last Thursday -- so, the proper
endpoint for this analysis about firearms is not February,
2019; it's June 25th, 2020 -- Jones was living in a house with
three loaded firearms in a bedroom. Now, his girlfriend
Ms. Houston claims that they were her firearms. But at this
point, on the evidence presented, there is strong reason to
believe that that is not the full story.

As an initial matter, I think there is a concern that
aside from what the FOID and CCL information says about
Ms. Houston being the registered owner of those firearms. As
between someone who has an attempted murder conviction and is
charged with serious heroin offenses during which he sold --
discussed selling firearms to the CS or a customer service
representative who works from home and is raising a teenage
son, I think there's at least a strong possibility that

Mr. Jones has joint possession of those firearms and may have been their real user or possessor.

I think Ms. Jones' purported ownership of the firearms is also questionable based on discrepancies in the information that she provided. Last week she told Pretrial Services that she's lived at the Broadview residence for 11 years. We've heard extensive testimony today about a 625 North Long Avenue address listed on the FOID and CCL records for Ms. Houston, and that's an address that is tied to Larry Jones based on mail that was observed and photographed at the Broadview residence.

So, the concern here is that either Ms. Houston was not fully candid with Pretrial Services about her residence history or she, either on her own or acting at someone's direction, provided a false address on her FOID and CCL application.

Finally, I just want to say that even if you, your Honor, believe that Ms. Houston was the sole and legal owner of those firearms, it's undisputed that those three firearms were loaded and unsecured in a bedroom that she shared with Mr. Jones, who, as I said, has a serious violent felony in his background. Those firearms were not stored under lock and key in a way that made Ms. Houston the only person who could access them. That was a dangerous environment that law enforcement encountered last Thursday.

1      Ms. Houston, I think, should be credited for her

2  cooperativeness with law enforcement.  But for today's

3  purposes, what it shows is it's corroborating evidence of the

4  statement Jones made to the CS about his access to firearms

5  and his willingness to sell one.  One week ago he was living

6  in a home sleeping in a bedroom with three unsecured firearms.

7      So, your Honor, based primarily on the combination of

8  the seriousness of the drug charges in this case, Jones'

9  statement to the CS about firearms and the corroborating

10  evidence that he did, in fact, have easy or ready access to

11  firearms as of last week, the government's position is that

12  Mr. Jones has not rebutted the statutory presumption that

13  releasing him would pose a danger to the community.

14      THE COURT:  Mr. Tunick, any response?

15      MR. TUNICK:  Yes, Judge, briefly.

16      Judge, the government argues that the inferences --

17  or there's a possibility that Mr. Jones might have possessed

18  the firearms that were in the house.  Well, we know one was in

19  Ms. Houston's purse.  There's no question about that.  So, the

20  inference clearly shows that she was possessing legally those

21  firearms -- that firearm.  I mean, she possessed legally all

22  of them.  They were in the house.

23      The government was up on the phone for Mr. Jones a

24  significant period of time.  I mean, if they had any

25  additional strength of evidence that he possessed a firearm,

1    they would have presented it to the Court.  They would have

2    surely said, Judge, we have this evidence that shows that he

3    was possessing firearms or carried or said he was strapping on

4    a particular date and he had talked to so-and-so or, you

5    know -- something more than just like this, you know, overly

6    broad inference.

7         And not to mention, you know, they did find them in

8    the house upstairs, you know, in a drawer that they couldn't

9    see the firearms.

10        So, I do think that that significantly reduces the

11   government's position, all that.  You know, where it was

12   found, how it was found.

13        They were led to the firearms by Ms. Houston.

14   Everyone was cooperative.  No one was, you know,

15   disrespectful, uncooperative.  They gave -- told them where to

16   find -- one was in her purse.  Couldn't find it.  They had to

17   dig deep into the drawer, which to me indicates it hasn't been

18   probably -- might not have been used or touched in a bit.

19        But all in all, there clearly are conditions that

20   would allow Mr. Jones to be released in this case.  I mean, we

21   have two individuals that reside at the home where he would

22   be.  His grandmother and his uncle who -- his grandmother, you

23   know, worked for Catholic Charities for, you know, 15 years

24   and is home pretty much all the time.  So, she -- she'll know

25   his whereabouts.  That's the kind of third-party custodian

1  that we typically like in the federal court, someone

2  who's there, is not going to -- doesn't -- isn't gone working

3  all evening and, you know, can't even monitor a particular

4  defendant.

5         I think we have rebutted the presumption.  And I

6  think the only issue is the dangerousness.  And really the

7  whole thing is these guns that they're alleging.

8         And I never said it wasn't a serious drug case.  I

9  know it's a serious -- it attaches some -- you know, there's

10  clearly -- a hundred grams triggers a mandatory minimum.  And

11  we will, I'm sure, be disputing the 851 enhancement down the

12  road.

13         But that shouldn't, you know -- shouldn't say that

14  he -- Mr. Jones doesn't qualify for a bond in this case.  I

15  mean, the statute favors release in circumstances like this.

16  What happened as a 16-year-old, I'm not sure that should carry

17  much weight at this particular time, especially -- I'm not

18  even sure he would be prosecuted as an adult in today's age --

19  today's criminal justice system.

20         So, nevertheless, I think we have put forth enough to

21  release him on certain conditions.

22         THE COURT:  Does the government dispute that Mr.

23  Jones' phone was tapped for at least some period of time?

24         MR. WALKER:  No, we don't, Judge.

25         But can I raise one point of clarification about the

1  wire evidence in this case?

2          THE COURT:  Sure.  Go ahead.

3          MR. WALKER:  So, as your Honor knows and as Mr.

4  Tunick drew my attention to the other day, by statute there

5  are procedures that have to be followed before the government

6  could introduce wire evidence in a proceeding like this;

7  specifically, the ten-day requirement.  So, I would just ask

8  your Honor to not infer that there is no evidence on the

9  wiretap about firearms just because you didn't hear any today.

10          That's all I want to say about the wire evidence.

11  And if I could, I'd like to respond to one other thing Mr.

12  Tunick said.

13          THE COURT:  Sure.  Let me just -- I just had one --

14  and I will certainly give you an opportunity, Mr. Walker.  I'm

15  not going to cut anyone off here.  We're not going to stop

16  talking until you both tell me -- so, don't feel like anyone

17  is going to get cut off.

18          Is Mr. Jones -- you know, one unfortunate side effect

19  of arrest is often that people lose their jobs while they're

20  waiting, trying to get bond, trying to get release.  Is

21  Mr. Jones still employed by One City United or has he lost

22  that job because of the delay?

23          That's not a criticism of anyone.  I'm just asking

24  factually if he still holds that job.

25          MR. TUNICK:  In my discussions with Mr. Jones --

1          Mr. Jones, you can actually speak up on this

2    particular point.

3          But he believes he could still have his job.

4          THE DEFENDANT:  Your Honor, yes, I can still have my

5    job.  Actually, it's a close friend of mine who running

6    everything by the name of Jason.  And I was one of the

7    supervisors, and I got five employees under me.  So, yes,

8    there's no problem with getting the job right back.  I could

9    be at work tomorrow if you present it.

10          THE COURT:  What do you do at One City United, sir?

11          THE DEFENDANT:  We clean up the city.  The whole city

12    of the Chicago area.  Every vacant lot.  We go around cleaning

13    up the trash and we got lawn mowers that cut the grass.  And

14    we do demolition as to all abandoned buildings.  We

15    demolition.  We clean all the abandoned buildings out.  And we

16    clean off the graffiti off the walls.

17          THE COURT:  Okay.

18          You've been employed there for two years?

19          THE DEFENDANT:  Yes, ma'am.

20          THE COURT:  Okay.  All right.

21          Mr. Walker, I think you said you wanted to respond to

22    a couple points.

23          Mr. Tunick, I'll give you a chance, too.  Like I

24    said, I'm not going to cut anyone off.

25          Mr. Walker?

1        MR. WALKER:  Yeah, just one point, Judge.  And it's

2  --

3        THE COURT:  Sure.

4        MR. WALKER:  -- trying to narrow the issues, frankly.

5        The gun that was recovered from the purse, it is not

6  the government's position for purposes of today's hearing that

7  Mr. Jones was in joint possession of the gun inside the purse.

8  The concern is the two guns inside the nightstand drawer;

9  particularly, the second gun, where Ms. Houston thought that

10  it was in the safe and it wasn't.  She didn't even know where

11  that pistol was.

12        In addition to the inconsistent address information,

13  that is probably the biggest red flag among the evidence

14  you've heard today; that Ms. Houston was not the sole

15  possessor or user of these weapons if she didn't even know

16  where a third loaded firearm in her bedroom was located.

17        THE COURT:  Okay.

18        Mr. Tunick, anything you want to add?

19        MR. TUNICK:  Judge, I would just indicate, like I was

20  trying to elicit -- that's why I was trying to elicit some

21  evidence of the circumstance of what was going on.  6:00

22  o'clock in the morning.  Her son is there.  The dog is

23  barking, has to be restrained.  They tried to shoot it with a

24  taser.  You know, they forced entry to the house, law

25  enforcement -- many law enforcement officers in the house.

1    I think that her -- that not knowing or not recalling

2  that the gun was -- might not have been in the safe, that it

3  was buried in a drawer -- is excusable under those

4  circumstances.

5         THE DEFENDANT:  Could I say one more thing?

6         THE COURT:  Okay.

7         Mr. Jones, on issues like this, I'd prefer you go

8  through your counsel.  And that's for your own protection,

9  sir, okay?  It's not that I want to cut you off or I don't

10  care what you have to say, but it's safest to go through your

11  counsel.  Okay?

12         MR. TUNICK:  Yes.

13         THE DEFENDANT:  Okay.

14         MR. TUNICK:  Thank you, Judge.

15         THE COURT:  For our Pretrial Officer Wiersema,

16  Pretrial had recommended release with curfew and a third

17  party.

18         Is the recommendation still release with curfew and

19  that the new third party that's been proposed is sufficient

20  for Pretrial's point of view?

21         MR. WIERSEMA:  Yes, Judge.  That would continue to be

22  so.  We do feel that the new third party is probably more

23  appropriate based on a lot of factors.  It's still our

24  recommendation.

25         THE COURT:  Okay.

1      Does anyone want to add anything before the Court

2  gives its ruling?

3      MR. TUNICK:  No, your Honor.

4      MR. WALKER:  No, Judge, nothing further from the

5  government.

6      THE COURT:  Okay.  All right.

7      So, first, I appreciate everyone -- how much everyone

8  took time today to present these issues and dig into them.

9  That includes the agents and both counsel.  I think it's

10 always good to do more than less in making these important

11 decisions.  So, thank you to everyone for their work.

12      In ruling on the government's request for detention,

13 the Court's guided by several principles.  One is the

14 presumption of innocence that Mr. Jones has, and nothing about

15 this hearing affects that.  He is presumed innocent going

16 forward.  And really what we're talking about today is, are

17 there conditions that would reasonably assure the safety of

18 the community and appearance in this case, largely coming out

19 of the presumption?

20      This is a presumption case, but it is rebuttable.

21 And that's not a high bar for the defense.  The defense has to

22 come forward with some evidence that's sufficient to rebut

23 that presumption.  And the government is moving, therefore, on

24 the presumption.  They're moving on non-appearance.  They're

25 moving on danger.  They're moving on all three grounds.

1    So, I'll start with appearance first because I think

2 that's rather easily dispatched in this case.  Although

3 there's the presumption of non-appearance, I think that the

4 defense has more than sufficiently rebutted that presumption

5 and brought forth plenty of evidence here that Mr. Jones would

6 not have a problem appearing if he were to be released.

7    He is employed.  He's a lifetime resident of the

8 Chicagoland area.  He has family here, that we've heard about

9 at some length today.  No history of substance abuse that

10 would lead to those kinds of problems.  And just in terms of

11 his showing up for court and what his record is on that, when

12 I look at his Pretrial report -- let me do this accurately --

13 he's had no even arrests since 2007.  And I'm just going back

14 here.  It looks like the last time he even had a bond

15 forfeiture was the early 2000s.

16    So, there's no -- not only has the defense rebutted

17 that presumption, but under the 3142(g) factors, I think there

18 would be no problem in terms of appearance in this case.

19    Obviously, the harder question is safety of the

20 community.  And the Court, again, is guided by the Bail Reform

21 Act, which is:  Are there conditions of release -- least

22 restrictive conditions of release -- that would reasonably

23 assure safety?  So, it's not a hundred percent.  It's

24 reasonably assure.

25    And the Court finds that the defense has not only

1    rebutted the presumption on danger, but also, in considering

2    the 3142(g) factors, that looking at both sides of the coin --

3    and I'm going to go through this in some detail, at some

4    length -- I do think there are conditions that will reasonably

5    assure the safety of the community here.

6            What the Court is going to impose is going to be more

7    restrictive than what Pretrial has suggested.  And that's in

8    an effort to take into consideration some of the evidence the

9    government has brought forward here.

10           So, at the end of the day, the Court is going to

11   allow Mr. Jones to be released, but that's going to be under

12   home detention and electronic monitoring.  I'm going to up it

13   from the curfew to take into account some of the issues that

14   the government has raised.  But let me go through those more

15   carefully.

16           In terms of nature and circumstances of the alleged

17   offense, it is a very serious drug charge.  It carries, as we

18   discussed at some length, a five-year mandatory minimum.  We

19   don't know how that will play out, whether there will be an

20   851 or not.  It's a serious drug charge, and there's no way

21   around that.

22           But Mr. Jones is not charged with anything in

23   relation to a gun.  He's not charged as a felon in possession.

24   He's not charged for any attempted gun sales or gun sales or

25   anything like that.  And the Court does note here not only

what he was charged with, but what he's not charged with.  And
I think that's important to keep in mind.

In terms of his history and characteristics, as I
noted, he is employed.  He's been employed for some time.
Lifetime resident.  Lots of family here.  I'm going to talk
about the third-party custodian, how important, I think, a
role she has to play here.  No history of substance abuse.

His criminal history is, in the Court's view, dated.
As the Court noted, he's had no arrests since 2007.  His last
serious conviction was in 2002, almost 20 years ago.  And that
was PCS felony.

There's been some talk about the attempted murder
charge.  Obviously, very, very serious.  Very serious.  But he
was 16 at the time of the conduct and now he's almost a
40-year-old man.  So, I think the datedness of that criminal
history really cuts against what that could suggest in the way
of any "dangerous" stemming out of that conviction alone.

The Court does take very seriously and appreciates
the government's evidence that has been presented today.  But
in the Court's mind, it does not rise to the level of evidence
sufficient to suggest that there's no conditions of release
that will reasonably assure safety here.  As the Court noted,
I'm going to increase from Pretrial's recommendation of
curfew.  I am going to increase that to home detention to
further protect the safety of the public.

1        But let me just run through how the Court found the

2    testimony and evidence here today.

3        Mr. Jones isn't charged with these things.  And if

4    the government had, in its view, sufficient evidence to charge

5    him, I think it would have.  There are other related charges

6    here -- other charges in this case -- where people have been

7    charged with guns and things like that.  And, so, I think if

8    the evidence was sufficient, Mr. Jones would be facing those,

9    as well.  And, so, I don't think it rises to that level.

10       We have a period of time -- I think the first mention

11   was September 18th of 2019 -- the government directs the CS to

12   try to buy some guns from Mr. Jones.  It doesn't happen.  We

13   go on through -- I guess the text photo is January 4th.  So, a

14   number of months where the CS is trying.  He's not able to buy

15   any guns from Mr. Jones.  No prices are discussed.

16       There is this picture that's texted; but, again, it's

17   not in conjunction with any prices.  None of the guns in that

18   picture match up with guns that were recovered from the home.

19       The guns at the home that were recovered, Ms. Houston

20   did have a permit.  I know there's some dispute about whether

21   that was active or not.  It explains that she could have had

22   legal possession of those.  And, again, Mr. Jones is not

23   charged with being a felon in possession of firearms.

24       The government has stipulated that there is no

25   evidence that these particular guns that were seized at the

1   home were involved in shootings.

2           I'm looking at my notes here to make sure I haven't

3   missed anything.

4       (Brief pause.)

5           THE COURT:  There's no evidence here that Mr. Jones

6   was ever found with a gun himself.  I understand there's this

7   argument about constructive possession about the weapons being

8   in the home; but, again, as I said, I think if the government

9   could get a charge in that, they would have.  Mr. Jones is

10  never seen personally with a gun.

11          I think it speaks well that Ms. Houston was

12  cooperative during arrest.  Mr. Jones was cooperative during

13  the arrest.  I think those are all positive things.

14          I'm just looking at my notes to make sure I haven't

15  missed anything here.

16      (Brief pause.)

17          THE COURT:  And, so, I just don't think, as I said --

18  in summary, based on all of those reasons, the Court does take

19  the testimony and evidence seriously, but I don't think it

20  rises to the level of no conditions that will reasonably

21  assure appearance.

22          And I think what the defense has proposed is a very

23  strong third-party custodian here.  I think Mr. Tunick's point

24  is well-taken that the best kind of third-party custodians are

25  the kind that are around all the time.  And the nature of her

1  being retired and staying in the house a lot because of the

2  unfortunate COVID situation, that's what we have in Ms. Moore.

3  And the Court will certainly be admonishing her as to her

4  responsibilities.  But we have her.  No convictions.  Great

5  employment record.  She's going to be around all the time.

6           There's also the uncle that lives there.  There's

7  going to be a lot of eyes on Mr. Jones.  And he's not going to

8  be allowed to go out for anything except employment and the

9  usual other activities.  So, it's going to be very, very

10  restrictive conditions, and eyes are going to be on him at

11  virtually all times.

12          And, so, for all those reasons, the Court does find

13  that there are release conditions here.

14          Before I actually go through all the conditions, Mr.

15  Tunick, do you think I've missed any reasons that you think

16  support release in this case?

17          MR. TUNICK:  No, your Honor.

18          THE COURT:  Okay.

19          And from the government's standpoint, I certainly

20  appreciate that you disagree with the result; but did I get

21  anything factually incorrect?

22          MR. WALKER:  No, Judge.

23          THE COURT:  I'm going to start going through the

24  release conditions here.  I'm going to start with Pretrial's

25  very -- as usual, very -- thorough look at these things.

1           So, it's going to be a 4500 unsecured bond.  Mr.

2     Jones has to submit to supervision by and report for

3     supervision to Pretrial Services.

4           Let me just stop at this point and say, Mr. Jones and

5     Ms. Moore, I want you to pay really good attention to what I'm

6     saying here because you need to follow all these rules.

7           And, Ms. Moore, you're going to be enforcing these

8     rules on Mr. Jones.

9           And, so, I'll take any questions at the end.  I just

10    want you to really key in on this part.

11          So, Mr. Jones, you'll be assigned a Pretrial Services

12    officer.  He or she will explain to you what you need to do to

13    be supervised by them and report to them, and you need to do

14    that.  What they tell you to do, you need to do that.

15          He's going to be in a third-party custodianship of

16    his grandmother Ms. Moore.  I will be admonishing her at the

17    end.  And he is to live there at her home on home detention,

18    location monitoring, and he's going to have to pay for the

19    cost of that location monitoring.

20          Mr. Jones, you're not allowed to possess any

21    firearms, destructive devices, other weapons.

22          Ms. Moore, are there any weapons in your home at this

23    time?

24          MS. MOORE:  No, ma'am, there's not.

25          THE COURT:  Okay.

1          Mr. Jones, you are not allowed to unlawfully possess
2     narcotic drugs or other controlled substances.

3          If you have any contact with law enforcement, if
4     you're even that passenger in a car and car pooling to work or
5     something and get pulled over by an officer, you have to
6     report that to your Pretrial Services officer right away.

7          In terms of home detention, you're only allowed to go
8     out for the following reasons, and I'm going to read them off
9     for you.  And your Pretrial Services officer will explain
10    this, as well, and explain to you with the location monitoring
11    how far outside the front door you can go, if at all.  It's
12    restrictive, and it's meant to be that way.

13         Let me just pull up the form here and make sure I
14    tell you specifically what you're restricted.

15         So, home detention, you're restricted to your
16    residence at all times except for employment.  And on that, I
17    only want it to be for a job that Mr. Jones currently holds.
18    I don't want him going out looking for a job.  If he's not
19    able to keep the job he has, he's going to have to look from
20    home.  And if that becomes an issue, he can apply to the Court
21    for leave to do something further.

22         Education, he can go out for.  Religious services;
23    medical; substance abuse; mental health treatment; attorney
24    visits; court appearances -- although those are going to be
25    largely telephonic for a long time; court-ordered obligations

1    or other things your Pretrial Services officer approves.

2            And, sir, they will go through with you what the

3    rules are in terms of what you have to tell them about your

4    employment schedule and that sort of thing.

5            Just running down the list of usual conditions here.

6            Mr. Tunick, does Mr. Jones have a passport?  I don't

7    believe I saw that in there.

8            MR. TUNICK:  Your Honor, all I know is he's never

9    traveled outside the United States.

10           Mr. Jones, do you have a passport?

11           THE DEFENDANT:  No, sir.

12           THE COURT:  Okay.

13           So, you're not allowed to get one.  You're not

14   allowed to get any international travel documents.

15           You need to show up for all court appearances.  If

16   you were to be convicted down the road, you have to show up

17   for any sentence.  If you don't do that, you would owe $4500;

18   but the bigger problem is you'd have to go back to jail based

19   on any violations.

20           For the government, I presume you would like the

21   usual condition that he's not allowed to have any contact with

22   any co-defendants in the case.  Would you like that spelled

23   out?

24           MR. WALKER:  Yes.

25           Can we also have the CS added to that list?

1          THE COURT:  That's fine, as long as the CS is

2   referenced by number.

3          Let me ask you this -- I see what you're saying.  I

4   want some sort of reference like maybe "the CS as noted in the

5   9-18-19 CPD report," or whatever.  I don't like vague

6   conditions, if that makes sense.  So, I just want the person

7   to be very much on record of who they can and cannot talk to,

8   if that makes sense.

9          MR. WALKER:  Yes.

10          I think what's already in -- based on what's already

11   in the record, referencing the CS who was discussed in that

12   CPD police report might be the most efficient way.

13          THE COURT:  Okay.

14          Anyone else that you don't want him to have contact

15   with?

16          MR. WALKER:  No.

17          THE COURT:  Okay.

18          So, Mr. Jones, what that means is the CS discussed

19   during the testimony today, you're not allowed to have any

20   contact with that person in any format, whether it's phone,

21   text, call, social media, can't yell at each other across the

22   street, none of that.  Can't have any contact of any sort.

23          I'm just going down a list here to see if there's any

24   others we need to address.

25      (Brief pause.)

1          THE COURT:  Officer Wiersema, any others that you

2     think we should add?

3          MR. WIERSEMA:  No, Judge.  I just checked our report

4     and those are ones we recommended.  So, nothing further.

5          THE COURT:  Okay.

6          Government, would you like any additional added in

7     any way?

8          MR. WALKER:  No, Judge.

9          THE COURT:  Okay.

10         So, I'd like to address our third-party custodian.

11         Ma'am, can you just put -- Ms. Moore, can you put

12    your full name on the record?

13         MS. MOORE:  Geraldine Moore.

14         THE COURT:  Okay.  Great.

15         And I know we've talked about you -- your employment

16    history.  You are Mr. Jones' grandmother, correct?

17         MS. MOORE:  Yes.

18         THE COURT:  So, you've known him your whole life,

19    right?  Or you've known him his whole life, I should say.

20         MS. MOORE:  Yes, I have.

21         THE COURT:  Okay.

22         Ma'am, here's what you need to do, and I'm going to

23    ask you if you're willing to do it:  You've got to supervise

24    your grandson.  You have to make sure -- you have to make

25    every effort to make sure that he's showing up for court.  Or

1  nowadays we're doing this telephonically.  So, you've got to

2  make sure he's making his court appointments.

3       And here's the biggest one, is the last one.  So, all

4  those rules we just went through, if you know he's breaking

5  any of those rules, he's breaking any federal, state or local

6  -- which he's not allowed to do either -- if he's breaking any

7  laws, if he's breaking any of these rules, you have to tell on

8  him to the Court --

9       MS. MOORE:  Yes, ma'am.

10       THE COURT:  -- to the Pretrial Services officer, even

11  though you know he will get in trouble for it and may go back

12  to jail.

13       MS. MOORE:  I understand.

14       THE COURT:  Are you willing to do that for the Court?

15       MS. MOORE:  Yes, ma'am.

16       THE COURT:  Okay.  All right.

17       Would the government like the third-party custodian

18  admonished any further?

19       MR. WALKER:  No, Judge.  Thank you.

20       THE COURT:  I should say, Mr. Tunick, they will not

21  release Mr. Jones until they actually have a signature of

22  Ms. Moore on the documentation.

23       MR. TUNICK:  Yes.

24       THE COURT:  And so --

25       MR. TUNICK:  Ms. Moore is actually in my office

1  suite.  She's in a separate office.  So, she is present here.

2          THE COURT:  Okay.  Great.

3          So, I would just urge you to work expeditiously with

4  the government and the Court to get that signature on file as

5  soon as possible, and that will expedite Mr. Jones' release.

6          Anything else that either party thinks we should

7  address at this point?

8          MR. TUNICK:  No, your Honor.

9          Thank you for your time.

10         MR. WALKER:  No, Judge.

11         THE COURT:  Government, anything else?

12         MR. WALKER:  No, Judge.  Thank you.

13         THE COURT:  Okay.

14         Pretrial Services officer, anything else?

15         MR. WIERSEMA:  Briefly, Judge.

16         So, procedurally, does the government provide copies

17 of this, what you just ordered, to the defense and then she

18 signs it?  Is that the way --

19         THE COURT:  I think that would -- I think --

20         MR. TUNICK:  Yes.

21         THE COURT:  -- that would be the best way to do it,

22 if -- Mr. Walker, if you're available to do that right now.

23         MR. WALKER:  Yes.  I believe Mr. Mitchell is

24 preparing the bond paperwork based on your Honor's order, and

25 we'll send it to defense.

1         THE COURT:  Okay.  Thank you for that.  I appreciate

2    that.

3         And, Officer Wiersema, how long would you like in

4    order to get that location monitoring installed?  I know that

5    there's limitations on what Pretrial can do on a short time

6    period.

7         MR. WIERSEMA:  I think if the Court would grant us

8    the 48 hours we've been utilizing.  Most of them have been way

9    shorter than that, but that does give us time to coordinate.

10   So, 48 hours if possible.

11        THE COURT:  Okay.  We will do that.  48 hours to get

12   it installed.  And, as Officer Wiersema points out, it's

13   usually less than that.

14        And when Mr. Jones is picked up from -- MCC or

15   Kankakee?

16        MR. TUNICK:  Kankakee, Judge.

17        THE COURT:  Okay.

18        So, when he is picked up from Kankakee, he needs to

19   go directly home.  No gas station stops.  No grocery stores.

20   No nothing.  Straight from the jail to home.  And he is not

21   allowed to leave that residence for anything until location

22   monitoring is installed.

23        So, Mr. Jones, you cannot leave your grandma's house

24   until location monitoring has been installed.  That includes

25   employment.  You have to wait until you are on location

1  monitoring.

2          Understood?

3          THE DEFENDANT:  Yes, ma'am.

4          THE COURT:  Okay.

5          Officer Wiersema, anything else?

6          MR. WIERSEMA:  Just that I'll reach out to Ms. Moore

7  at the conclusion of this call to get the logistics set up.

8          THE COURT:  Okay.

9          Thank you, everyone.

10          MR. TUNICK:  Thank you, your Honor.

11          MR. WALKER:  Thank you, Judge.

12                      *    *    *    *    *

13

14  I certify that the foregoing is a correct transcript from the
   record of proceedings in the above-entitled matter.

15

16
   /s/ Joseph Rickhoff                    March 3, 2021
17  Official Court Reporter

18

19

20

21

22

23

24

25